409 F.2d 395
 Louis SCHICK et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and
Truck Drivers, Oil Drivers, Filling Station and Platform Workers, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor, and
Transport Motor Express, Inc., Intervenor, and
Highway Drivers, Dockmen, Spotters, Rampmen, Meat Packing House and Allied Product Drivers and Helpers and Miscellaneous Employees, Local Union 710, I.B. of T., Intervenor.
 No. 16799.
 United States Court of Appeals Seventh Circuit.
 April 3, 1969.
 
 James R. Cox, David Shields, Chicago, Ill., for petitioners.
 Arnold L. Burke, Axelrod, Goodman & Steiner, Chicago, Ill., for intervenor, Transport Motor Express, Inc.
 Sherman Carmell, Sheldon M. Charone, Lawrence J. Weiner, Chicago, Ill., for Intervenor Local 705, Carmell & Charone, Chicago, Ill., of counsel.
 Asher, Greenfield, Gubbins & Segall, Chicago, Ill., for Local Union No. 710, Lester Asher, Chicago, Ill., of counsel.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Atty., N.L. R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Peter Ames Eveleth, Atty., N.L.R.B., for respondent.
 Before CASTLE, Chief Judge, and SWYGERT and KERNER, Circuit Judges.
 CASTLE, Chief Judge.
 
 
 1
 This case is before the Court on the petition of Louis Schick, Warren Haure, Marvin Bukle, Walter Vogel, Fred Johanes, James Boudouris, Jeane Kubers, Gus Viverito, Stanley Nedya, and Joseph Kowske to review and set aside an order of the National Labor Relations Board issued on January 20, 1967,[1] which dismissed the complaint issued against Local 705, Local 710 and Transport Motor Express, Inc. The dispute arose out of petitioners' loss of seniority when they transferred from Local 710 to Local 705 following the merger of Transport with Best Way of Indiana, Inc.
 
 
 2
 The complaint alleged that Transport violated Sections 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3), by delegating final and exclusive control over the seniority ranking of employees represented by Local 710 to the two locals, by giving effect to a seniority determination which gave twelve of those employees inferior ranking allegedly because they were not members of Local 705, and by constructively discharging five of the employees. The complaint also alleged that the two locals violated Sections 8(b) (1) (A) and 8(b) (2) of the Act by their participation in the above conduct by Transport. After a full hearing the trial examiner granted Transport's and the unions' motions to dismiss the complaint, on the ground that the General Counsel had failed to establish a prima facie case. The Board adopted the Examiner's opinion and affirmed his ruling.
 
 
 3
 The pertinent facts as disclosed by the record may be summarized as follows. Since the mid-1950's, Transport has had separate collective bargaining agreements with Local 710 and Local 705. The 705 agreement covered employees performing delivery of dry freight and the 710 contract covered employees engaged in meat hauling. Separate seniority lists were established and maintained for each unit. Wages and employee benefits were fixed for each unit by the respective contracts, except that Transport, without the knowledge or consent of Local 710, had, prior to February 1, 1964,[2] applied the 705 contract to 710 drivers where the agreements varied. Also, 710 drivers received a wage increase in January 1965, the date provided by the 705 contract, rather than February 1965 as provided by the 710 agreement.
 
 
 4
 During the middle 1950's, Transport began doing more dry-freight hauling and less meat hauling, and accordingly assigned 710 drivers to perform dry-freight work. Local 705 had continually protested that the 710 drivers were performing work which was within its jurisdiction,[3] and in the summer of 1962, as the result of a complaint by 705's business representative, 710 drivers were denied overtime dry-freight work. In September, 1962, an attempt by all the 710 drivers to transfer into 705 was successfully opposed by Local 710, and in the summer of 1963, an attempt by one 710 driver to transfer to 705 was again successfully opposed by 710 and Transport.
 
 
 5
 In May, 1964, Transport announced its impending merger with Best Way of Indiana, Inc.[4] Both before and after the merger was consummated in November, 1964, there were efforts made by some 710 members, especially Walter Vogel, to determine the effect the merger would have on them. Although various officials of Local 710 assured its members that their status would be preserved, on March 1, 1965, after the 710 drivers punched in upon their arrival at the terminal, and in the presence of representatives of both locals, the 705 business representative announced that the 710 drivers would "not pull a load of freight." The 710 members were told that no decision had been reached as to what was going to happen to them. Transport's terminal manager told them they would not be allowed to haul freight because of the jurisdictional dispute, and they remained in the terminal basement the rest of the morning.
 
 
 6
 At a meeting that afternoon in the company's salesmen's office, Company President Bauer, in the presence of the terminal manager, the 705 and 710 business representatives, and the eighteen 710 drivers, announced that the parties had decided that the 710 drivers would have to transfer to Local 705 in order to perform work which was within 705's jurisdiction. Bauer stated that they would have to go to the bottom of the seniority list, although he disagreed with that part of the decision. The 710 business representative acknowledged that the agreement had been reached and also stated his dissatisfaction with the transferees' loss of seniority. After two pollings of the 710 drivers, they refused to transfer and were told by the 710 business representative to report to work the next morning.
 
 
 7
 The next day, after being informed that they would be laid off by the company if they could not work, two 710 drivers met with the Secretary-Treasurer of Local 705, Louis Peick. After conferring with the 705 business representative, Peick stated that the 710 drivers would participate in 705's health and welfare benefits immediately, that he would try to get them pension benefits (although "he couldn't guarantee it"), and that the top six drivers on the 710 seniority list would stay in 710 and keep their seniority, although they would perform dry-freight work,[5] while the other 12 would have to transfer to 705 and go to the bottom of the 705 seniority list.[6] At first, these 12 drivers voted against transferring, but later signed dues check-off cards which authorized payment of dues to Local 705, stating that they were signing "under duress" and would file charges with the N.L.R.B.
 
 
 8
 We find that the record, taken as a whole, does not support petitioners' contention that they were given inferior seniority ranking because of their union affiliation. On the contrary, the record discloses that the 710 drivers received lower seniority rankings due to the fact that they became new members of the unit composed of 705 drivers, who were covered by a separate collective bargaining agreement.
 
 
 9
 The Courts and the Board have long recognized the statutory right of a union to bargain with the employer to protect its integrity by such methods as placing new members at the bottom of the seniority list. See Ford Motor Co. v. Huffman, 345 U.S. 330, 336-338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Anheuser-Busch, Inc., 112 N.L.R.B. 686, 690 (1955). Petitioners argue that since they had been working for the same employer and doing the same kind of work throughout the years involved, they should be given credit for these years in their seniority ranking. This ignores the fact that Local 705 had constantly protested the 710 drivers' infringement on its unit's jurisdiction. Such protest preserved the status of the two locals along unit lines.
 
 
 10
 Seniority rights are not vested, but "derive their scope and significance from union contracts, confined as they almost exclusively are to unionized industry." Aeronautical Indus. Dist. Lodge 727 v. Campbell, 337 U.S. 521, 526, 69 S.Ct. 1287, 1290, 93 L.Ed. 1513 (1949). See also Odelie v. Ross Gear and Tool Co., 305 F.2d 143, 149 (6th Cir. 1962). Thus, seniority is a valid subject matter for the collective bargaining process. See Humphrey v. Moore, 375 U.S. 335, 349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Nothing in the National Labor Relations Act "compel[s] a bargaining representative to limit seniority clauses solely to the relative lengths of employment for the respective employees." Ford Motor Co. v. Huffman, 345 U.S. 330, 342, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Seniority rights may be based upon such variables as the "nature of the work," Ford Motor Co. v. Huffman, supra at p. 339, 73 S.Ct. 681, or departmental membership. N. L. R. B. v. Wheland Co., 271 F.2d, 122, 124 (6th Cir. 1959).
 
 
 11
 In the instant case, the petitioners were placed at a disadvantage, not because they were members of another union, but because they were members of another unit. Their previous activity which had infringed upon the jurisdiction of the unit represented by Local 705 did not result in acquisition of seniority, or a right to seniority, in such unit. Under the authorities cited above, Local 705 had a right, if not a duty to its members, to protect the integrity of the unit it represented by placing the newly transferred drivers at the bottom of its seniority list.
 
 
 12
 "That the Act was so designed as to afford groups of employees of an employer the utmost freedom in their choice of a bargaining representative by permitting them to select such representatives in separate bargaining units, indicates that the statutory scheme did not contemplate that disparate treatment among employees in different units along unit lines would, by itself, give rise to a finding of discrimination. To hold otherwise would create a wholly unrealistic requirement that would impose intolerable conditions on an employer who had concurrent bargaining relationships with separate bargaining agents representing separate units of employees in the same or other plants of the employer." Anheuser-Busch, Inc., 112 N.L.R.B. 686, 690 (1955).
 
 
 13
 The fact that a substantial majority of the work of the 710 drivers had consisted of dry-freight hauling did not make them members of the unit represented by 705, since 705 had protested the infringement and had, at one point, pressed its complaint so far as to forbid Transport to utilize 710 drivers for overtime work in the dry-freight category. The final solution was a compromise. But it was the product of the collective bargaining system which we are upholding in today's decision. Rather than constituting prohibited arbitrary discrimination or proscribed delegation by the employer or the locals, the resolution of the dispute was accomplished within the framework of the type of labor-management relations encouraged by the Act. "A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co. v. Huffman, 345 U.S. 330, at 338, 73 S.Ct. 681 at 686, 97 L.Ed. 1048 (1953). As the Supreme Court noted in the above case, the existence of differences in the manner and degree to which the terms of a negotiated agreement affect individual employees or classes of employees does not invalidate the agreement and is, in fact, to be expected.
 
 
 14
 "Collective bargaining representatives have broad discretion to bargain with respect to seniority rights and this discretion should not be interfered with in the absence of some showing that a change in seniority rights resulted from hostile discrimination." Hardcastle v. Western Greyhound Lines, 303 F.2d 182, 188 (9th Cir. 1962). Since the evidence establishes that the change in petitioners' seniority rights resulted, not from an arbitrary discrimination based on their past union affiliation, but from the need to protect the integrity of the unit represented by Local 705, we hold that the record as a whole contains substantial support for the Board's finding and conclusion that the action taken to protect the seniority rights of the members of such unit did not violate the Act. Board findings so supported are not to be disturbed. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487-488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 15
 Since our holding on this issue disposes of the case, it is not necessary to discuss other issues tendered by the intervenors. Accordingly, it is ordered that the Board's order be affirmed.
 
 
 16
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Reported at 162 N.J.R.B. No. 99
 
 
 [2]
 The effective date of the most recent 710 contract
 
 
 [3]
 The parties stipulated that since 1958, a "substantial majority" of the worktime of the 710 drivers consisted of dry-freight hauling
 
 
 [4]
 Transport employed thirty 705 drivers and seventeen 710 drivers. Best Way employed sixty-four 705 drivers, one 710 driver, and a member of a third union. The combined operations of the new company were consolidated at the former Best Way terminal
 
 
 [5]
 The complaint did not allege discrimination in the decision to allow the six 710 drivers to remain in 710 while the remaining 12 were forced to transfer to 705
 
 
 [6]
 The 12 former 710 drivers were given seniority status as of mid-May, 1964, the date of the notice of the merger, rather than as of March 2, 1965, the date they transferred to 705