**H. G. FREEMAN et al.,**
Plaintiffs,

v.

**GRAND INTERNATIONAL BROTHER-HOOD OF LOCOMOTIVE ENGI-NEERS,** an unincorporated association and labor union, national in scope, and General Board of Adjustment of Brotherhood of Locomotive Engineers for the Eastern Seniority District of the Seaboard Coast Line Railroad, Defendants,

and

Seaboard Coast Line Railroad Company,
Defendant-Intervenor.

**Civ. A. No. 2775.**

United States District Court,
S. D. Georgia,
Savannah Division.

Jan. 19, 1974.

W. Lance Smith, Barnard M. Portman, Smith & Portman, Savannah, Ga., for plaintiffs.

Malcolm Maclean, Connerat, Dunn, Hunter, Houlihan, Maclean & Exley, P. C., A. Pratt Adams, Jr., Adams, Adams, Brennan & Gardner, Savannah, Ga.,

Harold A. Ross, Ross, Kraushaar & Bennett, Cleveland, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Preliminary Comments

LAWRENCE, Chief Judge.

Plaintiffs are locomotive engineers and firemen in the employ of Seaboard Coast Line Railroad Company (SCL). Prior to the merger of the Seaboard Air Line and Atlantic Coast Line railroads in 1967 they were employed by SAL in the Savannah District. Plaintiffs are members of the defendant Union, Brotherhood of Locomotive Engineers (BLE).

This action is brought under the Railway Labor Act, 45 U.S.C. § 151 et seq. Plaintiffs sue individually and as representatives of a class consisting of other former SAL enginemen similarly situated. On April 9, 1971, SCL was permitted to intervene as a defendant.

The contentions of plaintiffs will be dealt with later in detail. In sum, it is asserted that the defendant Brotherhood breached the duty imposed on it under the Railway Labor Act to represent the members in a fair and impartial manner.[1] It is alleged that the Union arbitrarily included the former SAL Savannah Yard district in the Consolidated Seniority District No. 2 of the merged Railroad with the result that two yards rather than one were embraced in the new District.[2] Plaintiffs also contend that the Union did not comply with the Constitution and By-laws of the Grand International Division of Brotherhood of Locomotive Engineers and that the "dovetailing" of the respective rosters of road and yard engineers was prejudiced

and discriminatory as far as plaintiffs are concerned.

Both BLE and SCL have moved to dismiss and also for summary judgment on the ground (among others) that former adjudications conclude plaintiffs under the res judicata doctrine. Some of the issues have been the subject of previous litigation involving other Seniority Districts of SCL. All of the cases terminated in favor of the Railroad and/or Union. The prior adjudications in other courts are:

Cole et al. v. Seaboard Coast Line Railroad Company, 65 CCH Lab. at § 11,567 (E.D.Va., 1970); aff'd. per curiam, 64 CCH Lab. at § 11,499 (4th Cir., 1971).[3] In this class action several former SAL employees in the crafts of engineers and firemen complained of the adverse effects upon them of the merging of the seniority rosters of the two railroads. Injunctive relief was sought. After a lengthy hearing the District Court ruled that BLE and SCL had acted in good faith and in conformity with the Constitution of the Union. Judge Merhige stated, "There is no evidence before the Court to warrant a finding other than that the Union and the railroad acted in good faith, and as far as the Union is concerned, under and in conformity with the Brotherhood's constitution." The Court added, "I think a really honest, sincere effort, from the evidence before this court, was made by the Brotherhood and by the railroad. Everything was above board as far as this evidence is concerned."

Price v. Seaboard Coast Line Railroad Company, Inc. et al., 332 F.Supp. 1093 (N.D.Ala., 1970), aff'd. 449 F.2d 1371 (5th Cir., 1971). The "dovetail percentage blocking" method used in merging

---

1. See Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

2. The new District included the former Savannah and Cooper (S.C.) yards of SAL. It is contended that this "created an imbalance in the consolidated district, in that it combined two SAL yard districts with one SAL road district. Plaintiffs, as road engineers on the SAL Carolina Division Mainline, were

adversely affected regarding their seniority in that the additional yard engineers included on the consolidated roster lowered Plaintiffs' positions by lowering the percentage of equity." See plaintiffs' proposed findings of fact.

3. The decision of the Fourth Circuit affirming the district court which is dated February 3, 1971, has never been officially reported.

the seniority rosters of engineers of ACL and SAL was bound to be a fair, reasonable and non-discriminatory method of consolidation.

Wheeler et al. v. Brotherhood of Locomotive Firemen & Enginemen and Brotherhood of Locomotive Engineers, 324 F.Supp. 818 was brought in the United States District Court for the District of South Carolina, Florence Division. On March 22, 1971, the District Judge granted judgment for the defendants and upheld the method of merging the seniority rosters as respects Consolidated Seniority District No. 1 of SCL.

Witherspoon et al. v. Grand International Brotherhood of Locomotive Engineers, Seaboard Coast Line Railroad Company et al., Common Pleas Court, Florence County, S.C. was a class action in which plaintiff engineers sought to enjoin the implementation of the merger of seniority rosters of road and yard engineers of ACL and SAL. The State court found that the method employed by the defendants was satisfactory; that BLE had fairly represented the craft of locomotive engineers and that the agreement between the Union and SCL in respect to merger of rosters in District 1 was a good faith solution without intention to inflict detriment on the plaintiffs. Judgment was rendered for the defendants in accordance with the findings of fact and conclusions of law. Apparently the ruling is the subject of an appeal to the Supreme Court of South Carolina.

Salter et al. v. Seaboard Coast Line Railroad Company and Brotheroood of Locomotive Engineers et al., Superior Court, Chatham County, Ga., Civil Action No. 5772. Twenty of the plaintiffs in the present suit were parties to this action in which similar relief to that sought here was prayed. The suit was voluntarily dismissed on December 6, 1968.[4]

I was tempted to grant the motions of the defendants for summary judgment in light of these repeated findings that the Union and SCL had acted in good faith; that the actions of BLE were in accordance with its Constitution; that the Union acted in the interests of the engineer and firemen crafts and that the method used in merging the seniority roster of the SAL engineers with that of the ACL was fair and equitable.

■ On second thought I concluded that an evidentiary hearing would be the wiser and better course. While two of the prior cases were denominated as class actions and were apparently treated by the courts as such the class affected was not specifically defined or designated by the trial court. Further, the class of road and yard engineers referred to in the complaint in Cole would have covered employees far removed from the site of the litigation and in another Circuit. Other considerations included the claim of unfair representation of the plaintiffs by the Union and the presence of factors not involved in the litigation elsewhere. Whether or not a union has acted in good faith and has honestly sought to serve the interest of all its members is ordinarily a factual question. The short cut of summary judgment frequently turns out to be the longest route.

I ordered an evidentiary hearing which was held at Savannah on October 13th last. The parties stipulated that to the extent it is applicable the transcript of the evidence in the hearing before Judge Merhige (500 pages) could be considered by this Court as a part of the record in the present litigation. H. Grady Freeman, a former SAL engineer, testified at length on behalf of plaintiffs and the class they represent. Marvin L. Geiger who is General Chairman on the Seaboard Coast Line Railroad Company for the Brotherhood of Locomotive Engineers testified for the labor organiza-

---

4. The same plaintiffs filed a complaint with the Interstate Commerce Commission ·(Finance Docket No. 21215) which was dismissed on May 29, 1968, on the ground that the disputes had to be resolved by and under the agreements out of which they arose rather than by the I.C.C.

tion. R. Irvin Christian, Manager of Labor Relations, SCL, was a witness for the employer-Railroad. A number of statistical and other exhibits were introduced.

Following the evidentiary hearing, the Court requested counsel for plaintiffs and defendants to submit proposed findings of fact and conclusions of law. They have done so. I am in complete accord with those presented jointly by BLE and SCL. I formally adopt them as the findings and legal conclusions of this Court.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs commenced this class action on March 22, 1971, against the defendants Grand International Brotherhood of Locomotive Engineers and the General Committee of Adjustment, Brotherhood of Locomotive Engineers on the Seaboard Coast Line Railroad (hereinafter referred to as "BLE") seeking to enjoin the continued use of a collective bargaining agreement of December 19, 1967, between BLE and Seaboard Coast Line Railroad Company (hereinafter "Seaboard") and the resulting consolidated seniority rosters for the craft of locomotive engineers employed on Seaboard's Consolidated Seniority District No. 2, and further sought an order directed to BLE to revise said consolidated roster by assigning numbered positions to engineers on disability annuities and to readjust the percentage equity allocations. Plaintiffs also prayed for lost wages and punitive damages. Plaintiffs' action is grounded on the charge that the defendants, for hostile and invidious purposes, discriminated against plaintiffs and breached BLE's duty of fair representation in not taking a vote of the membership for the purpose of consolidating seniority districts and rosters as allegedly required by BLE's Constitution and By-Laws, in placing together the separate road and yard rosters for engineers on the former Seaboard Air Line Railroad ("SAL") on a date of hire basis prior to consolidation

with the joint right road-yard rosters for the former Atlantic Coast Line Railroad ("ACL"), in labeling the position of disability annuitants rather than assigning them a number under the work equity allocation for their former district, as set forth in the BLE–Seaboard collective bargaining agreement of December 19, 1967, and the merged rosters provided for in said agreement. Seaboard thereafter intervened as a party defendant. The complaint was amended subsequently to claim in more detail that the rosters were consolidated without complying with the Constitution and By-Laws of BLE, which allegedly constituted a breach of contract with the membership of BLE as well as a breach of the duty of fair representation.

The defendants, including Seaboard, deny that they or any of them have been at any time guilty of hostile discrimination toward the plaintiffs or have acted arbitrarily or in bad faith, and further claim that the agreement of December 19, 1967, complies with Section 5(2)(f) of the Interstate Commerce Act, the report and order of the Interstate Commerce Commission relating to the Seaboard merger, and the terms and provisions of the prior Merger Protective Agreements for employees represented by BLE, that the agreement of December 19, 1967, and the resulting consolidated engineers' seniority roster in Seaboard's Consolidated Seniority District No. 2 (Eastern) places plaintiffs in the same relative position with respect to compensation, working conditions, fringe benefits, or rights and privileges pertaining thereto, and that the rosters were consolidated in a fair and reasonable manner. BLE also states that the aforesaid agreement and the resulting consolidated roster in Seaboard's Seniority District No. 2 (Eastern) are in accord with the terms of its Constitution and By-Laws, and nevertheless as a product of the collective bargaining process cannot be set aside unless effectuated for hostile and invidious purposes. Seaboard denies knowledge of the provisions contained in the organiza-

tion's regulations and denies that said provisions are binding upon it in the negotiation and execution of collective bargaining agreements as involved herein; and further asserts that the voiding of the December 19, 1967, agreement would thereby eliminate the consolidated seniority district and the merged engineers' seniority roster therein, which provide for the economies and efficiencies granted it by the Interstate Commerce Commission, and which was the consideration for the prior basic Merger Protective Agreement of November 10, 1966, setting forth the lifetime guaranteed earnings and employment requirements exceeding the employee protective conditions imposed by the Commission.

Based upon the pleadings, affidavits, exhibits, answers to interrogatories, and argument of counsel, and the testimony taken on the issues whether BLE engaged in hostile discrimination toward plaintiffs and the class of former SAL Carolina road engineers, which discrimination was acquiesced in by Seaboard, in inserting the disability annuitants on the consolidated seniority roster with a symbol rather than a numbered position and whether placing the former SAL Carolina yard engineers, including Cooper Yard, in Consolidated Seniority District No. 2 (Eastern) constituted a breach of the duty of fair representation, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) Plaintiffs herein are and have been since on or before July 1, 1967, employees of Seaboard or its predecessor railroads in the craft of locomotive engineers. More particularly, plaintiffs, and the class they represent, were employed prior to the Seaboard merger on the former Carolina road seniority district of the SAL. Plaintiffs H. G. Freeman, M. L. Wilson, W. L. Cowart, J. W. Reiser, Leroy Coats, J. W. Fell, R. L. Fears, F. W. Lord, J. B. Gooding, W. J. Furse, H. O. Griner, N. W. Parsons, Jr., and G. C. Wright, along with other members of the class composed of the former SAL Carolina road seniority district engineers employed on Seaboard's Consolidated Seniority District No. 2 (Eastern), are, and at all times pertinent hereto, have been members of defendant BLE; whereas the remaining named plaintiffs, along with other members of said class, are not members of defendant BLE and belong to another union, not a party to these proceedings and not certified as collective bargaining representative of the craft of locomotive engineers employed on the Seaboard.

(2) Defendant Seaboard is a corporation engaged in interstate commerce as a railroad "carrier" as defined in Section 1, Railway Labor Act, 45 U.S.C. Section 151, and Section 1 of the Interstate Commerce Act, 49 U.S.C. Section 1, and is subject to the provisions of said Acts. Seaboard is licensed to do business and is doing business within the State of Georgia and the Judicial District for the Southern District of Georgia. Seaboard is the merged successor company to the ACL and SAL railroads.

(3) Defendant Brotherhood of Locomotive Engineers has its offices in Cleveland, Ohio, and is a labor organization, national in scope, under the Railway Labor Act and the Interstate Commerce Act engaging in collective bargaining in the railroad industry. Defendant General Committee of Adjustment, BLE, on the Seaboard, with M. L. Geiger as General Chairman, has its offices in Leesburg, Florida, and negotiates collective bargaining agreements concerning rates of pay, rules and working conditions with Seaboard for the craft of locomotive engineers employed by said carrier and processes grievances and claims growing out of disputes over the interpretation and application of the collective agreements. BLE is the duly authorized exclusive collective bargaining representative under the Railway Labor Act for the craft of locomotive engineers on Seaboard.

(4) Collective bargaining agreements between the defendants BLE and Seaboard or the aforesaid predecessor companies have been in effect for many

years governing rates of pay, rules, and working conditions of the employees of the Seaboard in the class or craft of locomotive engineers represented by BLE.

(5) On July 1, 1967, pursuant to the regulations and orders of the Interstate Commerce Commission, the aforesaid predecessor companies merged to form the defendant Seaboard. The employee protective conditions imposed by the Commission and approved by the Federal courts provided for implementing agreements between the defendant Seaboard and the respective employee representatives, including BLE, as to the consolidation of work facilities and employment forces.

(6) While the Seaboard merger was still pending approval in litigation before the courts, the delegates to the BLE Convention met in Cleveland, Ohio, from June 27 through August 3, 1966. As a result of the many railroad mergers contemplated or pending before the appropriate authorities, Section 35 of the Standing Rules Section of the BLE Constitution was extensively revised, effective July 19, 1966, to give BLE's Grand Chief Engineer (the chief executive officer) considerable authority in the arrangements required by mergers, including the requirement to "immediately assign an officer for the purpose of directing the committees in the handling to the best interests of the members involved." Said Section 35 also provides that the "assigned officer in connection with the interested General Chairmen shall represent all of the committees in negotiations with the carrier and/or carriers."

(7) In the middle of September, 1966, Assistant Grand Chief Engineer L. S. Loomis was assigned to direct the committees in the handling of the merger negotiations for the craft of locomotive engineers on Seaboard's predecessor companies. Loomis, a national officer of BLE, held seniority as an engineer on the former Chicago, Burlington & Quincy Railroad, and was never employed by Seaboard. Along with the BLE General Chairmen on the former Atlantic Coast Line and the former Seaboard Air Line, H. W. Davis and M. L. Geiger, respectively, Loomis entered into negotiations with said railroads to satisfy the requirements of subsection II of Section 35(a), Standing Rules, to "first give full recognition to negotiating implementing agreements with the carrier or carriers and provide protection for all engine service employees." The protection to be obtained, if possible, was to include six items, among which were "guaranteed earnings and employment," and "preservation of the rights and equities of all engine service employees to service as locomotive engineers."

(8) On November 10, 1966, pursuant to the Railway Labor Act and Section 5(2)(f) of the Interstate Commerce Act, the BLE, through Loomis and the BLE General Chairmen on the former SAL and ACL, and the aforesaid predecessor companies of Seaboard entered into an agreement entitled "Agreement For Protection of Employees Represented By The Brotherhood of Locomotive Engineers In The Event of Merger of Seaboard and Coast Line Railroads." Said agreement embraced each of the six items referred to in Standing Rule 35(a)II, including guaranteed earnings and employment for the existing employees of the predecessor companies. Section 2 of said agreement, which provided guaranteed earnings, also contained a provision that all present engineer employees of the SAL and ACL were immediately certified as adversely affected without having to prove any direct adversity suffered by the employee by reason of the specific transaction as would be required under the ICC prescribed conditions. In consideration of these promises and in line with the Commission-imposed conditions, Section 3(b) thereof provided for the subsequent "consolidation of seniority rosters and seniority districts for engineers."

(9) Following the execution of the November 10, 1966, protective agreement, BLE's Loomis and the General Chairmen entered into almost continuous negotiations with management in which

all phases of the merger of the two railroads, including the consolidation of contracts and the various areas of consolidating seniority districts, were discussed. The final procedures or methods for consolidating seniority, however, were not resolved with management prior to a determination subsequently made by the General Committees of Adjustment as to precisely how seniority distribution would be handled.

(10) Section 35(a) I.D. of the Standing Rules of the BLE Constitution provides in pertinent part:

"Should it be, in the judgment of the officer assigned and the General Chairmen in the best interests of the members affected as a result of a merger, etc., to consolidate and/or merge a seniority district or districts, the General Chairmen shall consult with the affected Local Chairman to work out a merger of the districts and seniority rosters which shall be made on an equitable basis * * *."

Having obtained from the carriers information concerning the proposed changes in services, facilities and operations involved in the merger, including the contemplated transfer of work, all of the Local Chairmen, i. e., delegates to the General Committees on the SAL and ACL, were called into session in Jacksonville, Florida, on June 19–24, 1967, for purposes of consultation in conformity with the above-mentioned Standing Rule.

(11) At the Jacksonville meeting, the delegates of the General Committees were advised, among other things, of various accredited methods for consolidating rosters, including the dovetail percentage blocking method ultimately selected by them. Essentially, the dovetail percentage blocking method means that the individuals' names are taken from the former district rosters in sequence of their standing thereon and placed in turn on the consolidated roster in accordance with the positions delegated to each of the former districts based upon its work allocation equity or percentage ratio to the total of the work brought into the consolidated district by all former districts.

(12) Prior to the merger of the SAL and ACL to form defendant Seaboard, there were separate seniority rosters on the SAL for road engineers and yard engineers; whereas on the ACL, said road and yard seniority were combined on one seniority list for the craft of locomotive engineers. In view of this difference in the rosters on the former SAL and ACL, it was first necessary to equate or par them prior to consolidation of each to the other. Therefore, the delegates of the BLE's SAL General Committee met in special session during the meeting in Jacksonville and agreed to consolidate the separate SAL road and yard engineer seniority rosters on the basis of the individual's date of hire as a fireman except when said date would permit the individual to "run around" an engineer having a higher existing rank on the engineers' seniority roster. The Local Chairmen (delegates) from the ACL to General Committee agreed that this action would par the rosters of the SAL to ACL. Since the individual's date of hire was the base from which ACL engineers received combination seniority in road and yard service and was also the base on which SAL engineers received seniority standing in either road or yard service, this was considered an entirely satisfactory method for equating the rosters for purposes of the further consolidation of the ACL and SAL rosters.

(13) During the course of the Jacksonville meeting, the delegates were also advised of proposed drafts of six implementing agreements, which were subsequently executed on June 28, 1967. These agreements entered into by the BLE and the predecessor companies of Seaboard provided for the consolidation of seniority districts of said companies and were entitled "Implementing Agreements Numbers 1, 2, 3, 4, 5, 6." Implementing Agreement Number 2 related to consolidated Seniority District No. 2, also known as Eastern District, which district is the subject of this suit. Article I, Section 2 of each of said agree-

ments, which made provision for the consolidation of seniority rosters to be implemented in a further agreement, stated:

"One consolidated seniority roster, covering the districts described in Section 1 above shall be agreed upon, based upon each district's equity, other factors related thereto, and shall be maintained for this seniority district in accordance with the Engineers' Schedule Agreement."

(14) Article I, Section 1 of each of the said six agreements, including Implementing Agreement No. 2, described the seniority districts of the former railroads to be consolidated therein. Consolidated Seniority District No. 2 (Eastern) is composed of the former ACL Florence Seniority District (joint road and yard), the ACL Waycross District, Savannah Side (joint road and yard) the SAL Carolina Division Main Line (road seniority district), the SAL Carolina Division-Yard Service, comprised of the Savannah Yard, and the SAL Carolina Division-Cooper Yard (Charleston, S.C.). For many years, the engineers on the SAL Carolina Division-Yard Service, or Savannah Yard, seniority district roster protected the work at all yards in Savannah Proper and at four outlying yards, Americus, Columbus, and Bainbridge, Georgia, and Montgomery, Alabama. Seaboard proposed the composition of the consolidated district and suggested the inclusion of both the Savannah Yard district and Cooper Yard in Consolidated Seniority District No. 2. This suggestion was urged on the ground that it conformed to the plan of merger proposed to the Commission, permitted the employees involved to handle the same north-south traffic to which they were previously assigned, took into consideration the major points of manpower supply (Savannah, Georgia and Charleston, South Carolina (Cooper Yard)), as prior to the merger thus reducing the need for transfer of employees and possible relocations of residences, and would permit Seaboard to consolidate and coordinate the separate yard facilities of the former ACL and SAL at Savannah and Charleston in a manner permitting the employees working therein to adequately follow their work and to take available job opportunities at those points. This proposal was also made in view of the fact that the carrier intended to abandon its Andrews Line, thereby breaking the Carolina Line, which it did subsequently abandon. Based upon these grounds, the BLE negotiators were agreeable to the Seaboard's proposal, provided that each former seniority district was kept intact with all the men on its roster coming into the consolidated roster and that the engineers on the consolidated roster would have prior rights to the work at the four previously mentioned points until they failed to exercise those rights, at which time the yards at those points would be attrited out to Consolidated Seniority District No. 5 (Georgia), within which geographical area they are located. Each of the six consolidated seniority districts on the merged railroad contain at least one of the former SAL yard districts; three of the consolidated districts, including Consolidated Seniority District No. 2 (Eastern), contain two or more of the separate yard districts on the former SAL; and the seniority rosters for SAL yard engineers thereon were merged into the engineers' seniority rosters for the newly-created districts. No objection was raised by the delegates to the Jacksonville meeting as to the composition of the consolidated districts contained in the tentative agreements presented to them.

(15) After executing the implementing agreements on June 28, 1967, Assistant Grand Chief Engineer Loomis, the General Chairmen and the other members of the Executive Committees continued in Jacksonville obtaining and assembling certain data necessary for application of the dovetail percentage blocking method, drafting the agreement implementing Article I, Section 2 of the June 28, 1967, district agreements, preparing a consolidated schedule agreement, preparing the worksheets neces-

sary to merge the rosters in each of the six consolidated districts and finalizing those rosters.

(16) On October 4, 1967, the BLE and Seaboard entered into the consolidated Engineers' Schedule Agreement to become effective November 1, 1967, except that Articles 26 and 27 were not placed into effect until the seniority rosters were consolidated. Article 25(g) provided that "engineers' seniority will remain as established by agreement of June 28, 1967."

(17) On December 19, 1967, BLE and Seaboard entered into an agreement entitled "Implementation of Article I, Section 2, District Agreements 1 through 6, Signed June 28, 1967", that provided for the consolidation of seniority rosters of locomotive engineers pursuant to the formulae contained therein, which had been previously approved by the delegates in the Jacksonville meeting. By meeting of mutual agreements between defendants BLE and Seaboard and as a result of litigation, the consolidated roster for Seniority District No. 2 (Eastern) was not placed into effect until February 11, 1968.

(18) In order to consolidate the rosters of ACL and SAL in each of the six consolidated seniority districts, including Seniority District No. 2 (Eastern), the aforesaid agreement of December 19, 1967, first provided for the consolidation of the separate road and yard engineers' seniority rosters on the SAL, using the individual's date of hire as a fireman except where said date would permit him to "run around" an engineer having a higher existing rank on the former engineer seniority roster. In view of the fact that the same condition concerning "run arounds" existed on the ACL, the former engineers' rosters on each seniority district thereon were also cleared on the basis of the individual's date of hire as a fireman "except where said date would place an Engineer out of his respective standing as an Engineer and in which case he would follow the Engineer directly above him in his sen-

iority standing related to the other Roster or Rosters in that consolidation."

(19) Next, in order to consolidate the parred rosters between SAL and ACL engineers, the agreement of December 19, 1967, established the specific elements to be considered in the consolidation of those rosters under the work equity or percentage block method. These elements were:

a. Job starts of all engineers within each former seniority district.

b. Miles paid for, including engine hours of all engineers, within each former seniority district.

c. Earnings of all engineers within each former seniority district.

d. Number of men on the January 1, 1966, and July 1, 1966, seniority rosters of each former seniority district.

Section 35 of the Standing Rules of the BLE Constitution, which section sets forths the exclusive procedures governing the handling of merger-related problems, including seniority, provides for the use of these four elements in determining the proper ratio for consolidating seniority rosters on an equitable basis in the event of merger. While Standing Rule 34(c) states that "to consolidate or divide the seniority rosters of engineers on one or more seniority districts on a system a two-third vote of the active members holding seniority on each seniority district affected must be obtained," it is clear that a referendum vote is not required as to merger-related consolidations. A full reading of that section along with Standing Rule 35, particularly the subparagraphs of said provision set out in paragraph 10 above, which sets forth with specificity the procedures to be followed, and Section 35(d) which provides the provisions of Section 35 "shall prevail" in order "to insure appropriate handling of proposed mergers," establishes that Standing Rule 34(c) was inapplicable. In addition to the language and intent of Standing Rule 35, the discussions of the delegates to the 1966 BLE Convention effectively

show that there was to be no vote of the individual employees with regard to the consolidations and rosters, but consultations with the elected representatives of the affected former districts, as took place.

(20) Thus, each former seniority district's equity in the work of the new consolidated seniority district was determined on the basis of its percentage of the total work performed in the former districts as established by consideration of the four elements prescribed. The percentage equities derived for Seniority District No. 2 (Eastern) were:

| | |
|---|---|
| ACL Florence | 42.231% |
| ACL Waycross Savannah Side | 21.459% |
| SAL Carolina | 36.310% |

(21) Having determined the percentage equity of each former seniority district in the manner described above, the agreement of December 19, 1967, provided for the dovetail blocking of the former seniority rosters into one consolidated seniority roster for each of the six newly-created seniority districts, including Seniority District No. 2 (Eastern). The former rosters were consolidated as prescribed in said agreement. In transferring the names from the former seniority rosters of engineers to the consolidated rosters in the consolidated seniority district, each individual was inserted thereon in accordance with the positions delegated to his former district on the basis of its equity. In effect, this meant that the former SAL Carolina district engineers, including plaintiffs, were allotted about three of every nine positions in a block, or thirty-six of every one hundred positions on the consolidated roster. As between the engineers as a group on their former seniority district, each individual was placed on the consolidated roster in the same relation as his relative position to the other engineers in his former district. In view of the percentage block formula, the date of hire as firemen was not relevant as to the position on the consolidated roster between individuals from the different former seniority districts on ACL and SAL.

(22) At the time of negotiating Implementing Agreements Nos. 1 through 6 and at the subsequent Jacksonville meeting, recognition was given to preserving the rights and equities of all employees having an employment relationship or connection with Seaboard to service as locomotive engineers, including those persons on disability annuities whose names would remain on the respective seniority rosters until their employment relationship was severed upon receiving a retirement annuity at age sixty-five. In assembling data and in clearing the rosters, as previously described, the negotiators for both BLE and Seaboard noted that there were thirty-three disability annuitants and fifty-three engineer employees on sick leave. There were some of each category of employees appearing on the former rosters in each of the consolidated districts. Throughout the merged railroad, some were from the former SAL, and some were from the former ACL. In Consolidated Seniority District No. 2 (Eastern), there were five disability annuitants, three from the former ACL Waycross, Savannah Side, and two from the former ACL Florence seniority districts, Also, there were ten individuals on sick leave in Consolidated Seniority District No. 2 (Eastern), five on the former ACL Florence District, one on the former ACL Waycross, Savannah Side, two on the former SAL Carolina Main Line, and two on the former SAL Carolina Division-Yard Service. Additional investigation revealed that over eighty percent of the employees on sick leave returned to work, but ninety percent of the disability annuitants did not return to work.

(23) Based on the above information, BLE and Seaboard agreed that, in clearing the former rosters, the names of all engineers and firemen, who had been retired, dismissed, or deceased, would be deleted from the rosters. It was also agreed that all engineers and firemen out of active service on disability and

drawing a disability annuity under the Railroad Retirement Act, 45 U.S.C. § 228a et seq., would remain on the roster with "a symbol D.A. placed in front of their name instead of a number and will remain in their respective Roster positions." Section 3 of the December 19, 1967 Agreement so provides.

(24) However, in view of the facts that said annuitants would not likely return to work as engineers and that their inclusion on a roster consolidated under the percentage equity allocation method could distort, therefore, the job opportunities available to the employees in service on their former seniority district, Section 4 of the December 19, 1967, Agreement provides:

"In an effort to give each former District as much advantage as possible of every position within the percentage-blocking system of the Seniority District Roster of their respective Districts, and yet protect the disability annuitant at the same time, it is agreed the following will govern in the consolidating of the Rosters.

"Any position which carries the symbol D.A. (for disability annuitant) in front of the employee's name, on date set for merging Rosters, will be inserted in the new consolidated Roster in the percentage-block turn without a number. Only the symbol D.A. will be shown. The position next following on that Roster will be placed on the new Consolidated Roster immediately under the D.A. position and will carry the number of that position. The employee carrying the D.A. symbol will hold that position (regardless of his ability or non-ability to return to the service) until such time as his name may be removed in accordance with the applicable provisions of the Schedule Agreements covering seniority."

(25) None of the thirty-three engineers receiving disability annuities under the Railroad Retirement Act have exercised seniority or returned to work in the craft of locomotive engineers; and only one has returned to employment with Seaboard, as a locomotive fireman in Consolidated Seniority District No. 2. On the other hand, a former SAL Carolina Main Line engineer, J. E. Drexler, who had been carried on sick leave status for approximately thirty years, due to some form of blindness, was included on the Consolidated Seniority District No. 2 seniority roster in the same manner and on the same basis, and with a numbered position thereon, because Drexler had not applied for or was not receiving a disability annuity under the Railroad Retirement Act. In view of the facts that fifty-three individuals were on sick leave on December 4, 1967, the date for clearing the former rosters, that over eighty percent of said persons had returned to work as engineers in the past whereas over ninety percent of disability annuitants had not, that to determine on an individual basis the qualifications of each of the eighty-six persons, either on sick leave or receiving disability annuities, to return to service as engineers at that time or in the future would require the exercise of value judgments, would be highly speculative, and would lead to innumerable disputes and controversies, Seaboard and BLE judged that the test based on receipt of Railroad Retirement Act disability benefits was a reasonable standard upon which to determine whether said individual should be included on the consolidated seniority roster with a symbol or with a number.

(26) On or about November 14, 1967, plaintiff H. G. Freeman filed an appeal with General Chairman M. L. Geiger, which was followed by another appeal to the BLE Grand Chief Engineer transmitted by the Secretary-Treasurer of Division 803 on or about January 9, 1968. Said appeals were denied on the basis of an interpretation of the BLE Constitution and By-Laws made by its Grand Chief Engineer that the procedures of Section 35, Standing Rules, provided the exclusive method for handling merger related issues, including seniority.

(27) Parring the former separate road and yard rosters of the former

SAL on a date of hire as a fireman basis was a fair and reasonable way in which to equate those rosters with the joint right rosters of the former ACL, for generally happenstance determined whether an SAL employee was hired in road service or yard service and, on the other hand, former ACL engineers obtained joint rights to road and yard service on the same basis. It would have been an impossible task to break the ACL rosters into separate road and yard service. In fact, except on the former SAL and a few other railroads, road and yard rosters were already consolidated; and even these have now been merged or are in the process of being merged on this basis.

(28) The inclusion of the former SAL Carolina-Yard Service, as well as Cooper Yard, into Consolidated Seniority District No. 2 (Eastern) was based upon relevant and proper considerations. Such action was not taken for hostile or discriminatory purposes, and in fact was in accord with the Order of the Interstate Commerce Commission and consistent with the provisions contained in the "Agreement for Protection of Employees Represented by the Brotherhood of Locomotive Engineers in the Event of Merger of Seaboard and Coast Line Railroads" executed on November 10, 1966.

(29) Dovetail percentage blocking, as used by BLE and Seaboard, placed each engineer involved in the same relative standing or position in regard to work opportunity as he was in prior to the merger. Accordingly, said method constitutes a fair and reasonable method by which to consolidate rosters. In fact, from the filing of the complaint through the taking of testimony, each of the plaintiffs held the same or similar position as that held prior to the consolidation, had not been required to move their residences to take comparable positions elsewhere in the consolidated district, earned annually as much and more than prior to the merger, and had collected guarantee payments from Seaboard for any month in which the individual employee's earnings were less than his earnings prior to the Seaboard merger.

(30) The defendants herein, and each of them, did not enter into the agreements pertinent hereto for arbitrary or discriminatory purposes and did not apply the provisions thereof in such manner as to violate the duty of defendant BLE, as collective bargaining representative under the Railway Labor Act, to represent fairly all of the employees in the craft of locomotive engineers on the Seaboard, or its predecessor companies.

(31) The considerations used in reaching the agreement of December 19, 1967, and in preparing the engineers' seniority roster for Seniority District No. 2 (Eastern), were relevant and non-arbitrary, and appear to have been reasonable considerations which, in fact, led to a good faith and rational solution to a situation concerning which there could not be complete satisfaction to every individual involved. The defendants did not enter into any arrangement for the purpose of benefiting others at the expense of the plaintiffs or other members of the class of locomotive engineers on the former SAL Carolina Main Line seniority district, nor did they seek to or, in fact, inflict any detriment upon plaintiffs or other members of the class.

(32) No provision of the December 19, 1967, agreement for the consolidation of seniority rosters in Seniority District No. 2 (Eastern) conflicts with or is inconsistent with any provision of the "Agreement for Protection of Employees Represented by the Brotherhood of Locomotive Engineers in the Event of Merger of Seaboard and Coast Line Railroads" executed November 10, 1966.

(33) No provision of the December 19, 1967, agreement for the consolidation of seniority rosters in Seniority District No. 2 (Eastern) conflicts with or is inconsistent with any provision of the Implementing Agreement No. 2 for Seniority District No. 2 (Eastern) executed June 28, 1967. Specifically, no provision of said December 19, 1967, agreement conflicts with or is inconsist-

ent with Article I, Section 2, "Seniority Rosters," of said Implementing Agreement.

(34) No provision of the December 19, 1967, agreement for the consolidation of seniority rosters in Seniority District No. 2 (Eastern) conflicts with or is inconsistent with any provision of the Engineers' Schedule Agreement executed October 4, 1967, or any addendum thereto.

Based upon the foregoing findings of fact and the pleadings herein, the Court reaches the following conclusions of law:

## CONCLUSIONS OF LAW

A. This Court has jurisdiction of this suit and of the parties. The cause of action asserted arises under the Railway Labor Act, 45 U.S.C. Sections 151 et seq., and under the Interstate Commerce Act, 49 U.S.C. Sections 1 et seq. Jurisdiction of this suit exists under 28 U.S.C. Sections 1331, 1337.

B. The cause of action asserts a breach of the duty of fair representation by the statutory bargaining representatives as set forth in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S. Ct. 681, 97 L.Ed. 1048 (1953), and in Humphrey v. Moore, 375 U.S. 335, 84 S. Ct. 363, 11 L.Ed.2d 370 (1964). The gravamen of the rule is a bad faith motive or an intent to engage in hostile discrimination. Hardcastle v. Western Greyhound Lines, 303 F.2d 182 (9th Cir. 1962). There must be substantial evidence of fraud, deceitful action or dishonest conduct. Humphrey v. Moore, *supra,* 375 U.S. at 348, 84 S.Ct. 363. Although it is necessary to show that the claim is meritorious or that the union improperly balanced the rights and obligations of the various groups it represents, that in itself does not establish the requisite breach, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); for the breach is dependent upon the subjective mental processes or state of mind, Encina v. Tony Lama Boot Co., 448 F.2d 1264 (5th Cir. 1971). Thus, the standard of proof is unequivocally high. Since the duty is no more

than to forbear from engaging in hostile discrimination, it has been said:

"The arbitrariness shown must be of the bad faith kind . . . Something akin to factual malice must be shown." Cunningham v. Erie R. Co., 266 F. 2d 411, 417 (2d Cir. 1959).

C. The construction of the Standing Rules of the BLE's Constitution and By-Laws is for the union, through its appropriate officers; and such construction will be accepted by the courts in the absence of fraud, illegality or improper exercise of construction for arbitrary or discriminatory reasons. Crowley v. Broth. of Locomotive Engineers, 12 Ariz.App. 495, 472 P.2d 106 (1970), petition for review denied, No. 10195–PR (Ariz.Sup.Ct. Nov. 4, 1970); 87 C.J.S. Trade Unions § 13, p. 776. Having found that application of those rules by the BLE negotiators and that the interpretation made by the Grand Chief Engineer of BLE, who is the appropriate officer to do so under the BLE Constitution were reasonable and were not made for arbitrary, fraudulent or illegal purposes, the Court concludes that plaintiffs have made no showing of such improper conduct on the part of the BLE and that the provisions of the BLE Constitution were properly construed and applied.

D. That there may be differences "in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees" does not invalidate the agreement and is, in fact, to be expected. Ford Motor Co. v. Huffman, 345 U. S. at 338, 73 S.Ct. at 686; see also Schick v. National Labor Relations Board, 409 F.2d 395, 399 (7th Cir. 1969). Accordingly, in Humphrey v. Moore, 375 U.S. at 349, 350, 84 S.Ct. at 372, it was pointed out that the judiciary should not become immersed in the resolution of seniority conflicts by substituting its judgment for that of the bargaining representatives absent hostile or arbitrary discrimination based upon wholly irrelevant considerations, for judicial intervention under such circumstances would "surely weaken the

collective bargaining * * * processes." It follows from this, and the Court's ruling in Vaca v. Sipes, *supra*, that this Court would not supplant the decision of the negotiators or apply its views of the most appropriate solution as to the roster positions of the disability annuitants and personnel on sick leave and as to the composition of Consolidated Seniority District No. 2 (Eastern), merely because it thought that the union was "wrong", Cunningham v. Erie R. Co., *supra*, 266 F.2d at 417, or had "exercised poor judgment", Bazarte v. United Transportation Union, 429 F.2d 868 (3rd Cir. 1970). Upon the findings in this case, however, the Court concludes that the standards adopted and applied by the defendants BLE and Seaboard, relative to the disability annuitants and employees on sick leave and to the inclusion of the former SAL Carolina yard engineers as well as those yard engineers on the former SAL Cooper Yard in Charleston, South Carolina in the consolidated seniority district, were based upon valid and rational distinctions. Moreover, the Court adjudges that said arrangements were not made for hostile or invidious purposes, and did not breach the union's duty of fair representation.

E. The employee protective conditions, of which the Implementation Agreement dated December 19, 1967, is a part, provided protection for employees of Seaboard in the craft of locomotive engineers which is far in excess of the minimal requirements for protection contained in the orders of the Interstate Commerce Commission approving the merger and in the decision of the three-judge court which reviewed and approved those orders. Florida East Coast Railway Co. et al. v. United States, 259 F.Supp. 993, aff'd., 386 U.S. 544, 87 S. Ct. 1299, 18 L.Ed.2d 285 (1967).

F. The duty and the scope of the discretion of union representatives in the bargaining process has been variously but cogently stated in certain landmark cases.

In Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Court held:

"Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members, without hostility to any * * *.

"The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all who it represents * * *. Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must ·be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

In Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the Court stated:

"The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation . . "But we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another * * *. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes."

In Vaca v. Sipes, Admr., 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed. 2d 842 (1967), the Court ruled that"

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. See Humphrey v. Moore, supra; Ford Motor Co. v. Huffman, supra."

See also Hardcastle v. Western Greyhound Lines, 303 F.2d 182 (9th Cir. 1962), where no breach of the duty of fair representation was found although the seniority rosters as merged decreased seniority of some individuals; and Schick v. NLRB, supra, where relief was refused in the absence of a showing of hostile discrimination relating to a compromise solution, following the merger of two trucking companies, by which a group of drivers was required to transfer to another unit with total loss of seniority. In this case, the decisions made by BLE were undertaken in an attempt not to favor any employee or group thereof but to distribute the work opportunities on an equal basis; and the agreements between BLE and Seaboard and the rosters as consolidated have been upheld in Cole v. Seaboard Coast Line R. Co., et al., 76 LRRM 2529 (4th Cir. 1971); affirming No. 5614 (76 LRRM 2528) (E.D.Va.1970). See also opinion of Judge H. H. Grooms, in Price v. Seaboard Coast Line R. Co. et al., 332 F.Supp. 1093 (N.D.Ala., 1970), aff'd. 449 F.2d 1371 (5th Cir 1971), which held said agreements and the merged seniority rosters on Seniority District No. 4 (Western) to be valid.

G. Under the facts of this case and the principles of law referred to the Court concludes that the defendants did not enter into the agreements involved herein for arbitrary or discriminatory purposes; that they did not apply the provisions thereof in such a manner as to violate the duty of fair representation; that the method used for consolidating seniority rosters through dovetail percentage blocking was fair and reasonable; and that the union and the railroad acted in good faith, and as far as the un-ion was concerned, under and in conformity with the Brotherhood's Constitution. All employees in the craft of locomotive engineers were represented fairly and without hostile discrimination. Under the reasonable range of discretion permitted the collective bargaining representative, the defendant BLE negotiated and applied the agreements in accordance with its duty of fair representation.

H. The December 19, 1967, agreement for the consolidation of seniority rosters in Seniority District No. 2 (Eastern) is a valid collective bargaining agreement duly negotiated under proper authority by both the Seaboard and BLE.

In the light of the foregoing findings of fact and conclusions of law, the relief prayed must be denied and judgment entered for the defendants.