602 F.2d 664
 101 L.R.R.M. (BNA) 3100, 86 Lab.Cas. P 11,449
 Earl EKAS and Martin Feurer, Jr., On behalf of themselves
and all others similarly situated, Appellants,
v.
CARLING NATIONAL BREWERIES, INC., a Virginia Corporation,
and Brewery Workers Local Union No. 1010, affiliated with
the International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, and William J. Farley,
as the representative of a class of all Individuals employed
by Carling National Breweries, Inc., at its Dillon Street
Plant, Appellees.
 No. 78-1704.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1979.
Decided Aug. 3, 1979.
 
 Edward J. Gutman, Baltimore, Md. (Jacob Blum, Rochelle S. Eisenberg, Blum, Yunkas, Mailman & Gutman, P. A., Baltimore, Md., on brief), for appellants.
 Leonard E. Cohen, Baltimore, Md. (Neal Serotte, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for appellee Carling National Breweries, Inc.
 Marvin Poe Sklar, Baltimore, Md., for appellee Brewery Local No. 1010.
 Before WINTER, BUTZNER and PHILLIPS, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Earl Ekas and Martin Feurer, Jr., on behalf of a class of plaintiffs who are employees of Carling National Breweries' Beltway plant, seek to enjoin the enforcement of a memorandum of understanding between Carling and Brewery Workers Local No. 1010, their collective bargaining representative. The understanding, which arose out of Carling's decision to shut down its Dillon Street plant, merges the seniority lists of the Beltway and Dillon Street plants, with the result that some of the Dillon Street employees will be able to continue working while some of the Beltway employees will be laid off. Finding that the union possessed the authority to enter into the understanding and that, by doing so, it did not breach its duty of fair representation to the Beltway employees, the district court denied the requested relief. We affirm.
 
 I.
 
 2
 The facts are essentially undisputed. Since 1975, Carling has operated two facilities for the brewing and packaging of beer and other malt beverages in the Baltimore area: the Beltway and the Dillon Street plants. Although the employees at both locations were represented by the same union, Brewery Workers Local No. 1010, separate collective bargaining agreements, including separate seniority provisions, were negotiated for each plant effective July 1976. Neither agreement provided for the integration of the seniority lists of the two plants in the event of a consolidation of operations. Nor was any provision made for the amendment of the seniority terms so as to allow such integration.
 
 
 3
 In April 1978, Carling decided to close its production operations at the Dillon Street plant and to transfer at least part of those operations to the Beltway location. It was anticipated that, after the transfer, approximately 52% Of the combined production at the Beltway facility would consist of products formerly manufactured at Dillon Street. To determine how the employees at each plant were to be affected by the consolidation, Carling and the union entered into negotiations and eventually adopted a memorandum of understanding. The understanding provided, Inter alia, for the dovetailing of the seniority lists of the two plants on a one-to-one basis, beginning with the senior Dillon Street employee.[1] The agreement also specified that employees with ten or more years seniority at either plant would be preferred over those with less than ten years seniority for purposes of layoff and recall. The Dillon Street employees, as a whole, had served Carling longer than the Beltway employees. Moreover, because the combined production at the Beltway plant was to be less than the previous output of both plants, layoffs were expected.
 
 
 4
 The memorandum of understanding was ratified at a joint meeting of the Dillon Street and Beltway employees after the Beltway employees, who claim to have been outnumbered, walked out. The Beltway employees then filed this suit, seeking an injunction against the implementation of the understanding, a declaration that the understanding is invalid, and an award of damages. In an oral opinion, the district court denied relief, and the Beltway employees appealed.
 
 II.
 
 5
 This appeal raises two issues: whether the union had the authority to agree to the dovetailing of the seniority lists at the two plants, and whether, in so agreeing, it satisfied its duty of fair representation to the Beltway employees.
 
 
 6
 The original collective bargaining agreements covering the Beltway and the Dillon Street employees did not expressly provide for the integration of the seniority lists of the two plants in the event of a consolidation of operations. Nor was any power specifically given to amend the seniority terms of the agreements, so as to permit such an integration.[2] However, we think that, even in the absence of express provision, a union and an employer may assent to the modification of the terms of their existing collective bargaining agreements. This proposition is implicit in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), in which the Supreme Court upheld a contract amendment which gave World War II veterans seniority credit for pre-employment military service at the expense of other employees in the bargaining unit.[3]
 
 
 7
 The Beltway employees stress that only one collective bargaining agreement and one bargaining unit were involved in Ford, whereas here there were two agreements and two units. Since they had a separate agreement with the union, the Beltway employees suggest that the union was bound to pursue their interests to the exclusion of the interests of its other members. We find this reasoning unpersuasive. Whether the employees represented by a particular union constitute one or more units and whether they are covered by one or more agreements, the union still has the duty to represent fairly All of its members. To require it to favor one unit over another, without regard to the circumstances of the case, would make satisfaction of that duty impossible. Thus, where a union and an employer have renegotiated collective bargaining agreements covering a group or several groups of employees, the sole inquiry should be whether, under all the circumstances, the union has considered the interests of all whom it represents.
 
 
 8
 In upholding a contract amendment granting preferential seniority rights to a particular class of employees, Ford said the following with regard to the union's duty of fair representation:
 
 
 9
 Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents subject always to complete good faith and honesty of purpose in the exercise of its discretion.
 
 
 10
 345 U.S. at 338, 73 S.Ct. at 686. This standard was subsequently applied in Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), which found no breach of the union's obligation when, as a member of a joint grievance committee, it agreed to dovetail the seniority lists of two companies that had merged operations. Recognizing that the employees of one company or the other were going to suffer, the Court held that "(b)y choosing to integrate seniority lists based upon length of service at either company, the union acted upon wholly relevant considerations, not upon capricious or arbitrary factors." Id. at 350, 84 S.Ct. at 372.
 
 
 11
 Such was the case here. The Beltway employees allege no bad faith on the part of the union other than the union's failure to place their interests above the interests of the Dillon Street employees. Consideration of the interests of all its members is hardly an exercise of bad faith. Indeed, if the union had complied fully with the wishes of the Beltway employees, it would have breached its duty to represent fairly the Dillon Street workers. Nor was the union's resolution of the competing interests unreasonable. Since over half of the combined production at the Beltway plant was expected to consist of Dillon Street products, an endtailing provision putting Dillon Street employees after the Beltway employees in seniority would have been patently unfair. Likewise, a strict seniority provision would have unduly advantaged the Dillon Street workers, who had in general served Carling longer. So the union settled upon a dovetailing of the seniority lists on a one-to-one basis with an additional provision protecting employees with ten or more years of seniority from layoff. Under the authority of Ford and Humphrey and in the circumstances of this case, the union's action was eminently reasonable.
 
 
 12
 AFFIRMED.
 
 
 
 [1]
 Thus, for each department, the senior Dillon Street employee would be first on the combined seniority list, the senior Beltway employee second, the next senior Dillon Street employee third, the next senior Beltway employee fourth, and so on
 
 
 [2]
 The agreements did authorize the union to negotiate with Carling with respect to "any and all differences between the parties concerning the interpretation or application" of their terms. Likewise, the union's International Constitution required it to engage in collective bargaining whenever a dispute arose between its members and their employers. Because we conclude that the union possessed the inherent authority to renegotiate the terms of the agreements, however, it will not be necessary to consider whether such authority can be derived from these general provisions as well
 
 
 [3]
 Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), and Price v. International Brotherhood of Teamsters, 457 F.2d 605 (3 Cir. 1972), do not dictate a different rule. Unlike the instant case, those decisions dealt with the authority of an arbitration panel to dovetail seniority lists. To quote the district court: "(A)mendment is not subject to the same rule as arbitration. Since arbitration is itself a creature of the collective bargain, there is an inherent logic in preventing arbitration from adding to the contract terms. However, the same reasoning should not operate to prevent renegotiation."