Wallace T. SMITH et al.

v.

The B & O RAILROAD COMPANY
et al.

Civ. No. Y–78–26.

United States District Court,
D. Maryland.

March 13, 1980.

L. Robert Evans, Towson, Md., and Peter Max Zimmerman, Towson, Md., for plaintiffs.

Ransom J. Davis, Baltimore, Md. and Joseph B. Geyer, Baltimore, Md., for defendants B & O R. Co. and Western Maryland R. Co.

Norris W. Tingle, Baltimore, Md., and Norton N. Newborn, Cleveland, Ohio, for defendant United Transp. Union.

JOSEPH H. YOUNG, District Judge.

Wallace T. Smith and others seek declaratory, injunctive and punitive and compensatory monetary relief against the defendants, The Baltimore & Ohio Railroad Company (hereinafter "B&O"), The Western Maryland Railway Company (hereinafter "Western Maryland"), and United Transportation Union (hereinafter "United"). The plaintiffs allege that the defendants conspired in negotiating and implementing an agreement dated December 4, 1975, in violation of the Washington Jobs Agreement of 1936, the existing collective bargaining agreement, the United Constitution for the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, and the industry custom requiring employees to be transferred to "follow the work." Plaintiffs also allege that United violated its duty of fair representation and that the defendant railroads encouraged, facilitated, and participated in the breach.[1]

Plaintiff Smith, an employee of B&O, is chairman of Local 600 of United's East End Cumberland Division. Plaintiffs Miller, Kasecamp, Bruno, and Long are also B&O employees and United members. A class, represented by plaintiff was certified by rule of this Court dated June 25, 1979. The defendants are two railroad companies—both subsidiaries of the Chessie System—and the union which represents their employees.

Prior to 1975, the B&O and Western Maryland railroad systems were managerially as well as geographically distinct. On

---

1. Railroad employees, through their unions, have long insisted on job protection in the form of featherbedding, the one hundred mile-eight hour rule and other outmoded regulations. It is, therefore, ironic that the union finds itself a defendant as a result of its efforts to achieve some efficiency and economy in a transportation system that is sorely in need of innovative and visionary approaches to its problems if it is to provide the services needed in an energy conscious economy.

June 20, 1975, however, the Chessie System gave notice of its intention to merge the yard operations of the two into a single unit at Cumberland, Maryland. This consolidation required an integration of work forces which had been operating at Western Maryland's Knob Mount and Ridgely yards with the existing B&O crew at Cumberland. From July to December, 1975, negotiations dealing with the impact of the consolidation upon the workers at each yard were held between the union and the two railroads. Attending these negotiations were various persons representing Chessie, B&O, Western Maryland and United, including Plaintiff Smith.

Following an examination of test statistics from May, 1974 to April, 1975, the parties agreed to a work equity ratio of approximately eighty-twenty between B&O and Western Maryland—i. e., B&O employees would do 80% of the work in the consolidated yard, and Western Maryland would do 20%. To allocate the work according to this agreed division, a joint service list or "numbers system" was adopted.[2] Plaintiffs object to this "system" because Western Maryland employees generally enjoy higher rankings than B&O workers with the same length of service. Plaintiffs' objections to the numbers system are exacerbated by the railroads' decision to transfer the work performed at the Western Maryland yards at Knob Mount and Ridgely prior to consolidation to other locations. Plaintiffs object not only to the substantive terms of the consolidation, but also to the procedures employed by the defendants.

On December 4, 1975, the consolidation agreement was signed in Baltimore, Maryland. Shortly after the execution of the agreement, dissension and unrest increased among the B&O workers, and on December 21, 1975, a general meeting was held to allow them to air their grievances.

On December 29, 1975, Smith in a letter to the General Secretary and Treasurer of United's Board of Appeals challenged the consolidation agreement on behalf of Local 600. On January 6, 1976, he was informed that his letter would not be accepted as an appeal, because it did not contain supporting evidence as prescribed by United's Constitution. A second letter from Smith, dated March 10, 1976, was also rejected because it was filed more than ninety days after the challenged agreement.

In the spring of 1976, a referendum was held to test the attitude of the membership of United's B&O and Western Maryland locals as to the "number system." The B&O locals voted to abolish the "numbers system" in favor of a "straight seniority" system of job allocation. The Western Maryland locals, however, voted to retain the "numbers system." The leadership of the Union was unable to agree on steps to be taken to placate the dissatisfied B&O employees.

In December of 1977, the plaintiffs filed suit in the Circuit Court of Baltimore County and, at the request of the defendants, the case was removed to this Court in January, 1978. In December, 1978, the plaintiffs were permitted to amend their complaint and a class was certified by order of the Court dated June 25, 1979.

Following a two-week trial to the Court without a jury, the Court has concluded that plaintiffs' objections are without legal

---

**2.** Under the so-called "numbers system" a joint service list (also termed an order of selection list) is prepared which is utilized as a means of allocating jobs in the consolidated yard. Each worker retains his seniority as established by the seniority roster applicable to his group, as well as his seniority rights vis-a-vis all other members of his group; the separate units are combined according to the equity of work between the work forces. A number then is assigned to each man in keeping with his position on the joint service list and job preferences are honored according to a man's standing on the list, as determined by his number. In the instance of the consolidation of the B&O and Western Maryland yard crews at Cumberland, the equity of work was computed to be approximately 80% and 20%, respectively, so that the B&O men received four positions on the joint service list for every one position awarded to a Western Maryland man. During the negotiations, it was decided that the B&O men would receive the first two positions on the joint service list, and the Western Maryland men would receive the third position and each fifth position thereafter.

or actual foundation. The findings made herein shall constitute the findings of facts and conclusions of law in accordance with the requirements of Rule 52 Fed.R.Civ.P. whether or not specifically so designated.

*Plaintiffs' Substantive Claims*

At trial, the plaintiffs sought to prove that utilization of the numbers system in this particular factual context was, under an objective standard, arbitrary and capricious. In support of this contention, several B&O trainmen testified that Western Maryland men with substantially fewer years of service were ranked above them on the consolidated seniority roster. When, as the defendant railroads conceded, some of the switching work that had previously been performed at the Western Maryland facilities at Cumberland was transferred to other locations, some B&O men were furloughed. In addition, B&O trainmen testified that the consolidation of the work forces required them to take less desirable jobs and/or shifts. Also, B&O workers found their opportunities for promotion stymied as a result of the consolidation.

■ In order to prevail on this theory, it is not sufficient for plaintiffs to show merely "that the union improperly balanced the rights and obligations of the various groups it represents." *Freeman v. Brotherhood of Locomotive Engineers*, 375 F.Supp. 81, 93 (S.D.Ga.), *aff'd*, 493 F.2d 628 (5th Cir. 1974). Absent a showing of fraud or hostile motivation, courts have approved a wide variety of systems for merging seniority lists of entities that are consolidating their operations. The system of assigning seniority based on date of hire received Supreme Court approval in *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). A system depriving workers hired after a cut-off date of seniority rights has also received approval. *Hardcastle v. Western Greyhound Lines*, 303 F.2d 182 (9th Cir.), *cert. denied*, 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962). Several courts have rejected challenges to utilization of a numbers system. *See, e. g., Cole v. Seaboard Coast Line Railroad Co.*, 76 LRRM 2529 (4th Cir. 1971); and *Witherspoon v. Brotherhood of Locomotive Engineers*, 82 LRRM 2707 (S.C.1973). Finally, courts have permitted use of the numbers system in conjunction with a system of prior rights in which workers retained special rights after a merger or consolidation to work performed at their former company or plant, *Wheeler v. Brotherhood of Locomotive Firemen and Enginemen*, 324 F.Supp. 818 (D.S.C.1971), and in conjunction with the cut-off date method mentioned above. *Ekas v. Carling National Breweries, Inc.*, 602 F.2d 664 (4th Cir. 1979). Thus, while the plaintiffs are correct in their assertion that the "follow the work" concept has been used by some courts and arbitrators, *see, e. g., In re Country Belle Cooperative Farmers*, 48 LA 600 (1967); and *In re City of Green Bay*, 44 LA 311 (1965), it is nevertheless obvious that the "follow the work" policy is not a required element of a consolidation of work forces. Moreover, the deference shown by courts to the method of assigning seniority selected through collective bargaining is particularly appropriate in the context of this case. The railroad industry has been in decline for a number of years, and Congress has seen fit to enact laws "to facilitate merger and consolidation in the national transportation system." *County of Marin v. United States*, 356 U.S. 412, 416, 78 S.Ct. 880, 883, 2 L.Ed.2d 879 (1958). This Court is in accord with the views of the Court of Appeals for the Ninth Circuit which noted, in upholding a date of hire method as reasonable, that "[w]hile it may be that another method for consolidating the rosters at issue here would have satisfied a larger numbers of engineers affected by the merger, without more this Court should not substitute its views for those of officials elected by the employees to represent them in such matters." *Laturner v. Burlington Northern, Inc.*, 501 F.2d 593, 603 (9th Cir. 1974), *cert. denied*, 419 U.S. 1109, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975).

*Plaintiffs' Procedural Claims*

■ Plaintiffs asserted a variety of other procedural objections to the labor consolidation arrangements. First, the plaintiffs

contended that the December 4, 1975 agreement violated Rule 2(b) of their collective bargaining agreement. As conceded by the railroads, this rule does provide, by its terms, for seniority on a date of hire basis. Despite this provision, however, the numbers system has been in effect at the B&O Cumberland facility since 1945 when the seniority rosters of two groups of workers, the West End Division and the East End Division, were consolidated. A vote to abandon this system in favor of a date of hire or straight seniority system was taken in 1965 at which time the proposal to change the system was defeated. This Court must conclude, therefore, that the collective bargaining agreement was not intended to preclude utilization of the numbers system. This theory of recovery is also barred by the fact that courts have recognized the need for unions to adjust seniority rights in consolidation situations. In *Wheeler, supra,* for example, the Court was faced with a situation in which the use of a numbers system resulted in more senior workers having to move to less desirable positions than those retained by junior workers from the other workforce involved in the consolidation. The court granted the railroad's and union's motion for a directed verdict, noting that "seniority is a contractual right which . . . may . . . be altered . . . through the collective bargaining process." 324 F.Supp. at 824. *See also Deboles v. Trans World Airlines,* 552 F.2d 1005, 1014 (3d Cir.) *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977).

■ The plaintiffs also tried to show that even if the union was empowered to alter seniority rights, it did not employ the proper procedures in this case. More specifically, the plaintiffs claimed that United erred in failing to have the labor consolidation agreement ratified by the various locals. In support of this contention, plaintiffs rely upon Article 80 of the United Constitution entitled "Preservation of Craft Autonomy." Article 80(a) provides that "[l]ocal working conditions of a craft over which a local has jurisdiction may not be revised or changed unless authorized to do so by a majority of the votes cast by members affected and working in the craft." A number of B&O workers testified that they felt that their working conditions had been changed by the consolidation. In addition, plaintiffs correctly point out that "federal law does require a ratification vote if the union constitution or by-laws require it." *Deboles, supra,* 552 F.2d at 1018.

This Court rejects this claim for a variety of reasons. Article 90, which pertains to "Mergers, Leases, Coordinations, etc." states that in the event of a merger or similar transaction that "affects the seniority rights of employees . . . , General Committees of Adjustment shall arrange for a fair and equitable division of the work." Union officials were unanimous in their testimony that ratification votes were never taken in such situations. The union's interpretation of its constitution "will be accepted by the courts in the absence of fraud, illegality or improper exercise of construction for arbitrary or discriminatory reasons." *Freeman, supra,* 375 F.Supp. at 93. In this situation, the union's construction of its constitution was reasonable and consistently applied.

■ A more troublesome problem is the issue whether the Union breached its duty by failing to consider the appeal filed by plaintiff Smith. The evidence indicates that Smith attempted to file an appeal on December 29, 1975. This letter was not accepted as an appeal because it did not contain an account of the background facts as required of appeals to the Board of Appeals of United. Smith was informed of this by letter dated January 7, 1976. In addition, guidelines for filing an appeal were provided which contained information concerning the time period allowed under Article 75(f) of the constitution for filing appeals. Smith amended his appeal and attempted to submit it on March 11, 1976. Because he had not met the ninety day limit, however, this appeal was rejected. At trial, Smith testified that he understood the ninety day period to be tolled by the effective date of the agreement, which was

January 5, 1976, or by the date of receipt of a copy of the agreement which was December 15, 1975. Article 75(f), referred to in the guidelines supplied Smith, states unequivocally that the ninety day period is calculated "from the date of the decision of the General Committee of Adjustment" which, in this case, would be the date of signing, December 4, 1975. Smith's testimony that he did not receive the guidelines which would have provided him with this essential information is not credible. An examination of the appeal tendered by Smith in March indicates that it follows closely the guidelines. Therefore, the Court must conclude that he received them. Because Smith was clearly on notice of the time limits for filing an appeal, and because those limits are clearly stated in the United constitution, the Court finds that the union did not act arbitrarily in refusing to process the appeal.

Despite the union's rejection of Smith's appeal, United President Al Chesser did respond affirmatively to the request of the B&O General Chairman George Stanton to assign a Vice President to assist in resolving the dispute that had arisen concerning the labor consolidation. Vice President George Cahill studied the situation and made a recommendation that the numbers system be replaced with a straight seniority system. The plaintiff contended that this recommendation, which was concurred in by Chesser, was binding under Article 90. The relevant sections read: "Disputes arising under this Article [pertaining to Mergers, Leases, Coordinations, etc.] which cannot be resolved by the General Committees shall be referred to the International President [who] . . . shall promptly assign an officer to assist . . . in resolving the dispute. Failing to resolve the dispute the officer shall make a complete report and recommendation to the International President who, in turn, shall decide the dispute." As the plaintiffs interpret this provision, there was a dispute between the B&O and Western Maryland General Committees which Chesser was obligated to resolve. United, however, contends that the President lacked authority to alter the seniority system, because the Western Maryland workers at Cumberland voted against a change in the seniority system and, more importantly, that the numbers system was incorporated into the contract which was in effect. As stated above, it is not this Court's place to overturn official interpretation and application of the union constitution absent evidence of bad faith motivation. No such evidence was presented in this case. Moreover, the Court finds persuasive United's contention that the provision stated above pertaining to dispute resolution applies only to disputes arising during the negotiation process. The plaintiffs' suggested interpretation would permit United's President to override the decisions of the employees' duly elected bargaining agents.

The main thrust of plaintiffs' claim is the alleged failure of the railroads and/or the union to disclose and take into account in the negotiations the transfer of work from the Western Maryland Cumberland facilities to Connellsville and Hagerstown. A union would be liable for its failure to take into account relevant factors in the bargaining process. *See, e. g., Milstead v. Teamsters Local 957*, 580 F.2d 232 (6th Cir. 1978); and *Witherspoon, supra.* Thus, the Court must determine if this factor was not considered and if United acted arbitrarily in omitting this variable in negotiating the consolidation of the two seniority rosters.

One theory under which plaintiff seeks to recover is that the railroads breached their duty to disclose their true intentions concerning the movement of switching work out of Cumberland. *Cf.* Fanning, The Obligation to Furnish Information During the Contract Term, 9 Ga.L.Rev. 375 (1975). The Court is spared the task of determining whether, in fact, such a duty exists by the fact that the evidence establishes that this information was disclosed. On June 11, 1973, an application was filed with the I.C.C. for Western Maryland to obtain trackage rights over parallel B&O tracks. Later that month, the railroad notified union officials of its application to the I.C.C. On December 17, 1978, an I.C.C. hearing

was held at which Walter Weber, Jr., who was then Assistant to the General Manager of the Central Region of The Chesapeake and Ohio Railway Company (C&O) and the B&O, testified. Weber described the coordination of facilities which was to take place at locations including Connellsville, Cumberland, and Hagerstown. In this connection, Weber stated that "B&O's Connellsville terminal facilities will be used to process WM's eastward trains, which are presently being processed at WM's Cumberland terminal facilities." Weber testified further to the augmentation of the Connellsville work force and the reduction of the Cumberland work force that would result from such changes. Fred B. Plummer, the Director of Labor Relations also testified at that hearing. His statements related to the statutory obligation that "the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." 49 U.S.C. § 5(2). In this connection, Plummer testified that the unions had requested, and that the railroads had agreed to, "imposition of the *New Orlean*'s conditions to protect employees adversely affected by the proposed transaction." These conditions offer greater financial protection to workers than do those in the Washington Jobs Agreement to which the railroads are signatories. In addition, Plummer supplied an estimate of the cost of such protective payments. From these facts, the Court concludes that the union was on notice that significant changes in the location of switching operations were contemplated and the railroads were prepared to agree to generous terms with respect to protective payments.

The ICC approved the application for trackage rights and for abandonment of Western Maryland tracks on April 7, 1975. On June 20, 1975, United was notified that coordinations were planned at Connellsville, Cumberland, Keyser and Somerset. Negotiations concerning consolidation of the work forces commenced during July and continued through November. What is in dispute is the extent to which the railroads revealed their plans concerning relocation of switching operations.

All of the negotiators who testified agreed that Weber made a presentation at the outset explaining the railroads' plans for consolidations at these four locations. Mario DelSignore, the Western Maryland Trainmaster, also testified that the railroads updated the available information concerning changes in operations at the beginning of each negotiation session. Weber testified that he could not recall having explicitly stated that these operational changes would involve the transfer of switching activity. The railroad officials testified, however, that this information was easily inferable from the discussions of these interrelated coordinations that did take place and from some of the changes in operations that had already occurred as a result of the trackage rights agreement. The United negotiators, for the most part, stated that they were unaware of the fact that switching being done at Cumberland was to be transferred to other locations. In fact, some inferred the opposite from the fact that the B&O westbound yard which had fallen into disrepair was being renovated. They did admit, however, that such transfers often occurred when consolidations took place.

An examination of the evidence reveals that the railroads' plans concerning relocation of switching activity were readily inferable from the discussions that took place at the negotiating sessions. First, a number of United officials stated they were aware that after the trackage rights agreement, Western Maryland trains were being maintracked on B&O tracks which obviated the need for switching work to be performed at Western Maryland facilities. More importantly, the notes taken by Charles Selby, the Secretary of the Western Maryland General Committee, reveal that there were discussions from which the relocation of switching operations could be inferred. First, these notes reveal that maps of the areas to be consolidated were distributed at the initial negotiating session on July 9, 1975. Thus, even though the four areas of coordination were eventually separated for purposes of discussion, all of the

United officials were aware of the scope of the consolidation. Second, on August 9, 1975, when methods of allocating work after the consolidation were discussed, Vice President Caldwell explained that the equity system eventually used was preferable to a system of prior rights because it enabled carriers to make operational changes more easily. Thus, United was aware of the carriers' need to remain flexible concerning the locations at which switching work was to be performed. At the October 14 meeting, Charles Schuler, Director of Labor Relations for B&O, explained the railroads' intention to build up the facilities at Keyser and utilize them for pre-blocking of coal cars which would obviate the need for switching work to be performed at Cumberland or other locations. At this point, one of the United negotiators suggested that the railroads were asking for too much flexibility on the part of the union. Further explanation of the railroads' plans concerning Keyser was supplied by Weber at the October 15 session in response to a question posed by Vice President Clarence Caldwell of United. Finally, at the negotiating session on November 13, 1975, there was discussion concerning the fact that the Keyser and Cumberland situations were interrelated and that the labor consolidation agreements had to be drafted accordingly. Also, Plummer noted that some of the switching work being performed at the Western Maryland Knob Mount yard in Cumberland would be handled by B&O crews at Cumberland and that work equity should be computed to avoid giving the Western Maryland workers credit for this work at both locations. In fact, the Western Maryland employees were not given credit for this switching work at Keyser; rather, it was included in the Cumberland computation.

Thus, it is apparent from the information presented at the I.C.C. hearing and at the negotiations that United was on notice that some of the switching work performed at the Western Maryland facilities at Cumberland was to be relocated. The issue, then, is whether the union breached its duty of fair representation by failing to take this into account in negotiating the Cumberland labor consolidation. More specifically, the Court must decide whether United erred in using May, 1974 to April, 1975 as a test period for computing equity when, the parties are agreed, no changes in operations had taken place as a result of the consolidation.

Plaintiff has brought to the Court's attention decisions involving industries other than railroading in which it was found that the relocation or termination of work is a bargainable issue. *See, e. g., In re Royal Plating and Polishing Co., Inc.*, 63 LRRM 1045 (NLRB 1966). The conclusion that relocation of operations is a negotiable issue is supported by the Supreme Court's decision in *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In that case, the Court held that the decision to terminate operations at a particular location came within the ambit of "working conditions" which were negotiable under the Railway Labor Act. That ruling, however, was given in the context of deciding whether the employer was barred by the Norris-LaGuardia Act from obtaining an injunction to prevent a union from striking in protest of the railroad's decision to close down some stations. The precise question presented, then, was whether the circumstances constituted a "labor dispute" within the meaning of the Norris-LaGuardia Act, and not whether relocation of work constitutes a required subject for negotiation in the context of a consolidation.

Even if the relocation of operations may be a bargainable issue, it does not necessarily follow that the union has an obligation to bargain about it. In the factual context of the instant case, a variety of factors militate against this Court imposing such a duty. The evidence establishes that United's failure to investigate fully and bargain about the railroads' location of switching operations was not inadvertent. Numerous United officials stated that they considered such decisions to be the prerogative of management and that it would be completely impractical to require the railroads to pre-

dict accurately the level of switching activity at various locations because it would vary not only with the progress of consolidations, but also with fluctuations in business which might result from trends in economic activity in industries that rely on railroads. This judgment is reflected in Article 90 of the United constitution which requires the union negotiators to consider, in "arrang[ing] for a fair and equitable division of the . . . hours worked, cars and tonnage handled where applicable, and mileage of operations on each seniority district or territory involved prior to the change in operation [or] consolidation . ."

This Court's conclusion that United did not breach its duty of fair representation by making this judgment is bolstered by two decisions of the Supreme Court construing the ICC's obligation under 49 U.S.C. § 5(2)(f) to condition its approval of a consolidation on a finding that there is "a fair and equitable arrangement to protect the interests of the railroad employees affected." In *Brotherhood of Maintenance of Way Employees v. United States*, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961), the Court rejected the employees' "contention . . . that no compensation plan is adequate unless it is based on the premise that all the employees currently on the payroll remain in the surviving railroad's employ for at least the length of their previous employment up to four years." *Id.* at 172, 81 S.Ct. at 915. In rejecting this contention, the Court noted that Congress intended to facilitate consolidations in order to enable the railroads to be more competitive. Its review of the legislative history of this provision "clearly reveal[ed] an understanding that compensation, not 'job freeze' was contemplated." *Id.* at 176, 81 S.Ct. at 916. In reaching this conclusion, the Court also took notice of the fact that union practice was to insist solely on "compensatory conditions." *Id.* at 177, 81 S.Ct. at 917. The importance of protective payments in the context of a railroad consolidation was

also emphasized in the Court's decision in *Norfolk & Western Railroad Co. v. Nemitz*, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971). In that case, the Court held that the I.C.C. was statutorily obligated to review the adequacy of the protective payments agreed to by the parties.

■ Thus, United's decision to exclude from its consideration anticipated changes in the locations where switching work was to be done is eminently reasonable. In the case of railroads, as opposed to other industries, such changes occur frequently and unpredictably. A distinction is also appropriate based on the existence of statutorily mandated protective payments which are benefits not enjoyed by workers in most other industries and which obviate the need to bargain about job protection.[3] Finally, adoption of the "follow the work" policy advocated by the plaintiffs would necessitate frequent change of residence on the part of workers. Recognizing that employees are guaranteed against loss of earnings without having to accept employment opportunities located elsewhere, the Court must conclude that the present system serves the employees' interests better than that advocated by the plaintiffs.

Accordingly, for the reasons stated herein, it is this 13th day of March, 1980, by the United States District Court for the District of Maryland, ORDERED: that judgment BE and the same IS hereby entered in favor of the defendants.

---

**3.** *Cf.* Comment, *Duty to Bargain about Termination of Operations: Brockway Motor Trucks v. NLRB*, 92 Harv.L.Rev. 768 (1979) (The employer's failure to take into account the costs involved in displacing employees justifies imposition of duty to bargain concerning termination of operations).