**J. B. GOCLOWSKI, et al., Plaintiffs,**

v.

**PENN CENTRAL TRANSPORTATION COMPANY, Transport Workers Union of America AFL–CIO, et al., Defendants.**

Civ. A. No. 73–364.

United States District Court,
W. D. Pennsylvania.

Aug. 9, 1982.

T. Dean Lower, Hollidaysburg, Pa., for plaintiff.

Aloysius F. Mahler, Pittsburgh, Pa., Hermon M. Wells, Philadelphia, Pa., for Penn Central.

Richard D. Gilardi, Pittsburgh, Pa., Malcolm A. Goldstein, New York City, for unions.

## OPINION

WEBER, Chief Judge.

In November of 1972, following an agreement reached between the Penn Central Transportation Company and representatives of the Transport Workers Union of America, thirteen men employed at Penn Central's Eastbound Running Repair Shop in Altoona, Pennsylvania, changed their place of work to a shop located in Hollidaysburg, Pennsylvania, a town located some ten miles from Altoona. At the time of this agreement both the Penn Central Railroad and the Unions representing its employees were confronting enormous problems. At this time the Penn Central Railroad was one of the largest rail systems in the United States. It was, however, also one of the most financially troubled of America's beleaguered railroads. These financial troubles forced the Penn Central Railroad to declare bankruptcy and for a time threatened the very existence of the company.

These financial problems were a matter of great concern for the Unions representing workers employed by Penn Central. These Unions were justifiably worried regarding the job security of the many men and women who had worked for the railroad. Accordingly the Unions were attempting at every opportunity to preserve the jobs of all employees within the Penn Central system.

Given the enormity of the problems confronting both labor and management at this time, the transfer of these thirteen men from Altoona to Hollidaysburg would not appear to be a matter of any great moment. Yet this seemingly minor incident has triggered a dispute which has now continued for more than a decade. The principals in this dispute are the thirteen transferred employees; their employer, Penn Central (now Conrail); and the local and international unions representing these men. This dispute has been carried on in several forums; including the National Railroad Adjustment Board, the United States District Court for the Western District of Pennsylvania, and the United States Court of Appeals for the Third Circuit. It is a controversy which has already inspired two opinions by this court; *Goclowski v. Penn Central Transportation Company*, 516 F.Supp. 1276 (W.D.Pa.1981), *Goclowski v. Penn Central Transportation Company*, 423 F.Supp. 901 (W.D.Pa.1976), and on one occasion has received full consideration by the United States Court of Appeals for the Third Circuit, *Goclowski v. Penn Central Transportation Co.*, 571 F.2d 747 (3d Cir. 1977).

We are now prepared to write the final chapter in this long standing controversy. This case comes before the court for findings of fact and conclusions of law following a non-jury trial held November 30, 1981. At this trial all parties were afforded an opportunity to present evidence in the form of testimony and documentary exhibits and to argue the force and effect of the evidence presented. At the conclusion of this trial we directed that the parties file proposed findings of fact and conclusions of law along with any trial memoranda

deemed necessary. Thus, all parties have been given a full opportunity to be heard on this matter.

Despite the length and complexity of its presentation this lawsuit appears to involve a relatively simple question. At the heart of this controversy lies the plaintiffs' allegation that the defendant Unions, acting in concert with the defendant Railroad, conspired to contract away the seniority rights of the men employed at the Eastbound Car Repair Shop. Upon a complete review of the testimony and documentary exhibits introduced before this court, along with the arguments and proposed findings submitted by counsel, we conclude that there is no merit to this allegation. Accordingly we will order judgment entered for the defendants in this matter.

## 1. FACTS

The plaintiffs are some thirteen men who, in the fall of 1972, were employed by the Penn Central Transportation Company as carmen or car inspectors. These men worked at the Eastbound Car Repair Shop, which was part of Penn Central's Allegheny Division. The Allegheny Division was divided into two districts for the purpose of determining seniority—the Eastbound District and the Westbound District. All of the plaintiffs herein had accrued seniority in the Eastbound District.

The defendant, Penn Central, was a large rail carrier and the employer of these men. Penn Central has since transferred its rail assets to the Consolidated Rail Corporation (Conrail). The defendant Transport Workers Union of America is a labor union and an unincorporated association which was the authorized representative of the carmen and car inspectors employed by Penn Central. Local 2017 was a subordinate unit of the Transport Workers Union representing carmen employed in the Altoona area, including the plaintiffs. The individual named defendants were officers of the defendant unions at the time of this incident.

Sometime in the fall of 1972 Penn Central officials informed representatives of the union of their intention to close the Eastbound Car Repair Shop located in Altoona, Pennsylvania, and to convert that plant into a facility for performing programmed repairs on railroad cars. Because this action would effectively displace the thirty-three men then working at the Eastbound Plant the company wished to consult with the Union prior to taking any action.

As a result of these consultations an agreement was reached between the Union and management. This agreement, dated November 1, 1972, provided that the Eastbound Car Repair Shop would become a part of the Altoona Heavy Repair Seniority District. The agreement further provided that twenty of the carmen employed at the Eastbound Car facility would be surplussed and transferred to the Altoona Heavy Repair Shop. The agreement provided that none of these twenty men would lose any seniority rights as a result of this transfer. Rather the seniority of these transferred men would be dovetailed into the seniority roster of the Altoona Heavy Repair Shop.

Following this agreement the remaining employees at the Eastbound Car Repair Shop, including the plaintiffs, bid on and obtained work at a newly created shop called the Madden Shop. The Madden Shop was located in Hollidaysburg Pennsylvania, some ten miles from the former Eastbound Car Repair Shop. This shop was part of the Westbound Seniority District. For the most part the employees bidding on jobs at the Madden Shop had sufficient seniority within the Eastbound District to permit them to transfer to the Altoona Heavy Repair Shop. These men, however, elected not to accept such transfers. The choice of many of these thirteen men was dictated by economic considerations. If these men bid on jobs at the Madden Shop they would have an opportunity to work on what was called the wreck train. Members of the wreck train crew were able to earn substantial overtime, amounting to between $5,000 and $8,000 per year. Therefore, many of these thirteen employees bid on jobs in the Westbound District because they were interested in obtaining the overtime pay associated with those jobs.

One consequence of this decision by these men was a diminution of their seniority rights. In November of 1970 the Eastbound and Westbound Seniority Districts were combined by agreement. Under this agreement employees in each district acquired seniority rights in the other district. These seniority rights were determined by the "top to bottom" method. Employees transferring from one district to another acquired seniority at the bottom of the seniority roster of the district into which they were transferring. Therefore these thirteen men who bid on jobs at the Madden Shop were placed at the bottom of that shop's seniority roster.

This diminution of seniority rights seems to have had little concrete impact on the plaintiffs. Following their transfer to the Madden Shop, none of these men were furloughed by the company. They continued to work for Penn Central doing essentially the same work that they had previously performed at the Eastbound Shop. Many continue to be employed at the Madden Shop to this day.

It is undisputed that the November 1, 1972 agreement between the Railroad and the Union was never ratified by the affected employees. This failure to obtain ratification lies at the heart of this dispute. The plaintiffs contend that both the Union constitution and prior practice demanded that all agreements affecting employees' seniority rights be referred to the rank and file for ratification. According to the plaintiffs both the Union and management were aware of this limitation on their authority to enter into collective bargaining agreements affecting employees' seniority yet they chose to ignore it. The plaintiffs contend, therefore, that this collective bargaining agreement is invalid for failure to obtain the necessary ratification. In this lawsuit the plaintiffs pray for a declaratory judgment that the November 1st agreement is invalid and for damages arising out of the Union's and Company's breach of their duty of fair representation.

Given the nature of the plaintiffs' allegations it is clear that we cannot consider the events of October and November 1972 in isolation. Rather these actions must be seen as the product of a long history of dealings between Penn Central and the Transport Workers Union. Therefore, we must examine these events in the context of the prior collective bargaining history of this industry.

The Penn Central Transportation Company was formed in the early 1960's as a result of the merger of two existing rail systems—the Pennsylvania and the New York Central Railroads. Prior to this merger the plaintiffs herein were employees of the Pennsylvania Railroad. These Railroad employees were organized into a large number of distinct seniority districts. Under the collective bargaining agreements existing at that time, changes in seniority districts could be made only with the concurrence of two-thirds of the affected employees. (Tr. at 209–210). Thus throughout the 1950's proposals to change seniority districts were routinely submitted to the rank and file for their approval. (Tr. at 195–196).

This policy had two unfortunate results. First, it severely limited management discretion when making policy decisions which incidentally affected employees' seniority. Many of the seniority units in the Pennsylvania Railroad were extremely small, with some containing only a single employee. (Tr. at 188). Because the collective bargaining agreements allowed the members of each seniority district to vote on any proposal which adversely affected their seniority, these small units could effectively veto any company proposal which impacted upon them. This problem was illustrated by the testimony of plaintiffs' own witness, Mr. John Horan. In describing how the ratification process worked Mr. Horan explained that on one occasion a seniority roster consisting of a single employee prevented the merger of several seniority districts by refusing to ratify the merger proposal. (Tr. at 188).

In addition this policy led to inequities within individual seniority districts. Many of these larger seniority districts were made up of several small groups working at dif-

ferent locations. On occasion, management made proposals which would improve the seniority rights of one of these small groups. These proposals were frequently blocked by the membership of the district as a whole. Thus, the ratification process often frustrated the interests of certain employees within seniority districts. This problem was a matter of concern, not only for management, but also for the union leadership, which felt that some mechanism had to be devised to protect the interests of individual employees within large seniority districts. (Tr. at 387).

With the merger of the Pennsylvania and New York Central Railroads, it became apparent that some concessions would have to be made by labor if the new Penn Central system was to operate efficiently. Accordingly, in October of 1964 the Penn Central Transportation Company and the Transport Workers Union entered into a Merger Protective Agreement. (Plaintiffs' Ex. 27). In this agreement Penn Central guaranteed the former employees of the New York Central and Pennsylvania Railroads some measure of job security. In return the Union agreed that the Railroad would have the right to transfer work throughout the entire merged system and that the Union would execute implementing agreements to carry out any necessary employee transfers. (Tr. at 294–295).

Following execution of the merger protective agreement the Union entered into an Implementing Agreement. (Plaintiffs' Exhibit 2). This agreement established procedures for the transfer of employees across seniority lines. Essentially the agreement provided for notice to the employees of any pending transfers and guaranteed that any employee being transferred would carry his seniority with him into the receiving district. Thus under the Implementing Agreement a transferred employee had his seniority dovetailed into the seniority roster of the district receiving him. (Tr. at 298–300).

Finally in November of 1970 the Transport Workers Union entered into a new collective bargaining agreement with the Penn Central Transportation Company. Rule 3–B–2 of this agreement provided that seniority districts could be adjusted by written agreement between the representatives of the Union and those of management. In a departure from prior practice this revised Rule 3–B–2 did not call for any membership ratification of proposals affecting employees seniority districts.

All of the agreements mentioned above were submitted to the rank and file for their approval and each was duly ratified by the Union membership. (Tr. at 209–211). Thus beginning in the late 1960's, the practice of submitting questions affecting employees' seniority to a vote by the rank and file had been changed dramatically. Agreements dealing with employees' seniority were no longer routinely submitted to the membership for approval. Instead management, by unilateral action and by agreement with the Union, made these decisions. This policy change provided management with much broader discretion when making business decisions which impacted upon employee seniority.

At the time of these changes Railroad management sorely needed such discretion. By the early 1970's the problems plaguing all of America's railroads had overtaken the Penn Central system and forced it into bankruptcy. Railroad management was desperately attempting to insure that the entire system would continue to operate. As part of these efforts management was forced to dramatically curtail some of the railroad's activities and significantly cut back on the railroad's work force.

It is against this background that the November 1st, 1972 agreement was made. At the hearing held before this court representatives of both the Union and the Railroad indicated that they believed ratification of this agreement to be unnecessary. (Tr. at 369–370, 387, 405–406). Both labor and management viewed the November 1 agreement as the logical extension of a process which had begun in 1964 with the Merger Protective Agreement. Since that time labor had, in a series of accords, given the Railroad the right to transfer work

throughout the Penn Central system. In return the Unions had received much needed guarantees of job security from management. To facilitate the transfer of employees across seniority lines the Union had entered into a merger Implementing Agreement and had changed its basic collective bargaining agreement to allow for alteration of seniority districts by simple agreement between representatives of the Union and management. All of these changes had received the approval of the rank and file prior to their implementation.

Therefore by 1972 both the Union and management believed that these changes were firmly in place. In fact by 1972 management had already taken advantage of these changes and had unilaterally shifted employees from one seniority district to another on several occasions. For example on at least one occasion employees in the Eastbound Seniority District had been transferred to other seniority districts by unilateral management action. Thus both the Union and management believed that the procedures followed in November of 1972 were wholly in accord with the applicable collective bargaining agreements and past industry practice.

In fact at the time they entered into the November 1 agreement Union officials believed that they were acting in the best interests of the men employed by the Eastbound Car Repair Shop. These Union officials recognized that under the merger protective agreement the Railroad could assign surplus workers to any job within the entire Penn Central system. Therefore, the men surplussed by the closing of the Eastbound Car Repair Shop could have been transferred by the Railroad to jobs far removed from their homes. Accordingly, the Union attempted to protect the interests of these men by obtaining a guarantee from the Railroad that they would be transferred to the Altoona Heavy Repair Shop and not to some distant facility.

Following the November 1 agreement the Eastbound Shop was closed, converted to a programmed repair plant, and reopened. Many of the men employed at the reopened plant possessed skills similar to those of the plaintiffs. The nature of the work they performed, however, had changed significantly. This plant was now engaged in the systematic renovation of railroad cars which had been removed from service. Previously the plant had merely performed temporary, minor repair work on cars that were in service.

When the Eastbound Shop was reopened, the plaintiffs protested to their union representatives. These men complained that they had not been informed that the shop would be reopened at the time of their transfers. The plaintiffs were unsuccessful in resolving this dispute through internal union procedures. Accordingly, on March 21, 1973 this action was filed in the Court of Common Pleas of Blair County, Pennsylvania. The case was subsequently removed to the United States District Court for the Western District of Pennsylvania.

As originally framed, the plaintiffs' complaint alleged that the Union and Railroad had acted improperly in three respects. First, the plaintiffs argued that the November 1 agreement breached the terms of prior collective bargaining agreements between Penn Central and the Transport Workers Union. Second, the plaintiffs contended that both the union constitution and past industrial practice called for ratification of the November 1 agreement by union membership. Third, plaintiffs asserted that the November 1 accord was the product of a conspiracy by the Railroad and the Union to contract away the seniority rights of the men working at the Eastbound Shop.

On December 20, 1976 we entered an opinion granting summary judgment for the defendants and dismissed the plaintiffs' complaint in its entirety. In this opinion we concluded that the breach of contract and ratification claims fell within the exclusive jurisdiction of the National Railroad Adjustment Board. We further held that the plaintiffs had failed, as a matter of law, to establish a conspiracy by the Railroad and Union to diminish the seniority rights of the plaintiffs. *Goclowski v. Penn Central Transportation Co.*, 423 F.Supp. 901 (W.D.Pa.1976).

The plaintiffs appealed this finding to the United States Court of Appeals for the Third Circuit. The Court of Appeals affirmed our conclusion that the plaintiffs breach of contract claim lay within the exclusive jurisdiction of the National Railroad Adjustment Board,[1] but reversed our findings with respect to the plaintiffs other two allegations. *Goclowski v. Penn Central Transportation Co.*, 571 F.2d 749 (3d Cir. 1977). The case was then remanded to this court for further proceedings.

## II. DISCUSSION

This case has been the subject of extensive litigation over the past decade. As a result of this litigation the legal issues now confronting us have been narrowed considerably.

This matter is now before the court for findings of fact and conclusions of law as mandated by the Court of Appeals. In its opinion the Court of Appeals isolated two issues which, in its view, required consideration on a complete factual record. These issues were:

(1) Did the Union's constitution or past industrial practice require that the November 1, 1972 agreement be submitted to the Union membership for their approval?

(2) Did the Union, in combination with the Railroad, violate its duty of fair representation by contracting away the seniority rights of the men employed at the Eastbound Car Repair Shop?

We have allowed the parties a full opportunity to be heard and to present evidence on these two issues. We have conducted a careful review of the evidence and the arguments of counsel on these two questions. Upon the completion of this review we conclude that there is no merit to the plaintiffs' allegations on either of these issues. Accordingly we will enter judgment for the defendants in this matter.

■ Turning initially to the question of ratification we feel that the plaintiffs have failed to demonstrate that either the Union constitution or past industrial practice required submission of the November 1 agreement to the rank and file for their approval. At the outset plaintiffs' argument that past industrial practice mandated ratification is fatally deficient in two respects. First, the plaintiffs' proofs at trial failed to show a clear pattern of prior ratification. Admittedly some agreements effecting employees' seniority were presented to the Union membership for their approval. (Tr. at 182–198). For the most part, however, these agreements involved changes in seniority Districts occurring before the Penn Central merger. Following the merger there is no clear pattern of employee ratification. Quite the contrary, on numerous occasions Railroad management unilaterally took actions adversely affecting the seniority rights of Penn Central employees. None of these actions were ever submitted to the Union membership for their approval. (Tr. at 403, 404, 405–406). Thus we find that as of November 1972 there was no clear course of conduct requiring Union ratification of management decisions effecting employees' seniority.

Moreover to the extent that a prior practice of ratification did exist that practice was expressly abandoned by the Union and Railroad prior to 1972. We find that the merger of the Penn Central system fundamentally changed the nature of the relationship between labor and railroad management. With the merger of the Pennsylvania and New York Central Railroads the Union and management entered into a merger protective agreement. In this agreement the Railroad provided the Union with assurances of job security for its members. In return the Union gave management greater discretion in transferring employees throughout the Penn Central system. A necessary incident of this greater discretion was greater management influence over employees' seniority rights.

1. The NRAB subsequently concluded that the November 1, 1972 agreement did not violate the terms of prior collective bargaining agreements between Penn Central and the Transport Workers Union.

In order to enable management to freely transfer workers throughout the Penn Central system the Union executed an implementing agreement. This agreement established procedures for employee transfers and insured that the seniority rights of transferred employees would receive some protection. Significantly, however, the implementing agreement did not give local seniority districts any right to vote on proposed employee transfers. The Union also provided in Rule 3–B–2 of its 1970 Collective Bargaining Agreement for the revision of seniority districts by written agreement between representatives of the Union and management. Accordingly, under the 1970 Collective Bargaining Agreement the consent of the effected employees was no longer required in order to make seniority district changes. Thus by 1970 the power of management to unilaterally effect employees' seniority had been expanded considerably and the right of the Union rank and file to approve such actions had been reduced significantly.

All of these changes had taken place with the consent of the Union membership. Each of these agreements was ratified by the rank and file prior to taking effect. Moreover in return for these concessions the Union received an important commitment from management. In the merger protective agreement the Penn Central Transportation Company guaranteed these employees some measure of job security. Given the desperate financial position of the Railroad this was a significant concession by management, one which ultimately may have protected the jobs of many Penn Central employees. Thus we conclude that the plaintiffs have failed to show any clear industrial practice requiring ratification of agreements effecting employees' seniority at the time of this incident, November 1972.

■ Nor do we believe that the Union constitution mandated employee ratification of the November 1 agreement. Admittedly the constitution of the Transport Workers Union of America does generally call for employee ratification of collective bargaining agreements. (Plaintiffs' Ex. 3,

Art. XXV Section 2). It is clear that the November 1 accord was never submitted to the Union membership for their approval. Nonetheless we believe that the Union was acting within the scope of its authority under the constitution when it entered into this agreement.

The November 1 agreement was the direct product of several other collective bargaining agreements, each of which was duly ratified by Union membership. Taken together these agreements conferred on the Union and management the authority to transfer workers and change seniority rosters without the prior consent of the effected employees. Through these agreements the rank and file effectively delegated to management and union leadership the power to change seniority rosters. Since each of these agreements was entered into with the consent of the Union membership, we feel that they are consistent with Article XXV, Section 2 of the Union constitution. Therefore the delegation of authority accomplished by these agreements does not in our view offend the Union constitution.

Together the merger protective agreement, the implementing agreement and the 1970 Collective Bargaining Agreement provide the framework for all of the actions taken by the Union and management in the fall of 1972. These agreements allow management to close some of its operations and transfer employees to other jobs within the Penn Central system. They provide for the dovetailing of seniority when any employees are so transferred. They also authorize the revision of seniority rosters by agreement between representatives of labor and management. Therefore, the actions taken by these defendants in the fall of 1972 are wholly consistent with the existing collective bargaining agreements, agreements which were duly ratified by membership.

■ Despite this fact the plaintiffs now complain that the November 1 agreement improperly denied them their accrued seniority rights because it was not submitted to them for ratification. We disagree. The plaintiffs have no absolute right at federal law to demand that all agree-

ments between the Union and management be submitted to the membership for ratification. Rather membership ratification is necessary only when such ratification is required by the agreement itself or by the constitution, by-laws or rules of the Union. See *Confederated Independent Union v. Rockwell Standard Co.*, 465 F.2d 1137, 1140 (3d Cir. 1972). Moreover, it is clear that "it is legally permissible for a Union to forego ratification of a collective bargaining agreement by its membership." *Aikens v. Abel*, 373 F.Supp. 425, 435 (W.D.Pa.1974). Therefore the Union can change its internal policy regarding contract ratification and forego such ratification when necessary or appropriate.

In this case we believe that the Union, with the consent of its membership, did agree to forego ratification of all agreements dealing with modification of seniority districts. By November 1, 1972 the Union membership had delegated to its leadership the power to enter into such agreements without prior ratification. This delegation of authority was accomplished by the 1970 Collective Bargaining Agreement and was done in a manner consistent with the Union constitution. Similarly by 1972 the rank and file had ratified a series of agreements which gave management the authority to unilaterally close its operations and transfer employees throughout the Penn Central system. Again this delegation of authority was accomplished in a manner that comported with the requirements of the Transport Workers Union's constitution.

Thus management could have accomplished the same result in this case by simply closing the Eastbound Shop and arbitrarily transferring these employees to the Altoona Heavy Repair Shop. If management had elected to take this action without conferring with the Union the plaintiffs would have been in precisely the same situation. They would have had to choose between transferring to the Altoona shop or bidding on jobs in the Westbound District. Furthermore had management acted unilaterally there could be no argument that its conduct violated the Union constitution.

Given this prior delegation of authority by the union rank and file we conclude that ratification of the November 1 agreement was no longer required by the Transport Workers Union's constitution. Accordingly we hold that that agreement was not invalid for failure to obtain such ratification.

Finally, we believe that the plaintiffs have failed, on this record, to carry their burden of proof on the question of unfair representation by either the Union or the Railroad. In this case the Transport Workers Union, and its Local 2017, were the exclusive bargaining representatives of the carmen working in the Altoona area. This relationship, which is created and defined by statute, imposed certain responsibilities on the Union. Foremost among these was the duty to fairly and impartially represent the interests of the rank and file to management. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964); *Medlin v. Boeing Vertol Co.*, 620 F.2d 957, 961 (3d Cir. 1980). This duty of fair representation is a logical incident of the Union-Employee relationship and precludes the Union from dealing with its membership in a manner which is either arbitrary, discriminatory, or in bad faith. *Gainey v. Brotherhood of Railway & Shipping Clerks*, 313 F.2d 318, 322 (3d Cir. 1963). This duty is a strict obligation; one which extends to all aspects of the Union's activity on behalf of its membership, including negotiations related to employee seniority. *Hardcastle v. Western Greyhound Lines*, 303 F.2d 182, 185 (9th Cir. 1962); *Smith v. B&O Railway*, 485 F.Supp. 1026 (D.C.Md.1980).

The duty of fair representation does not, however, narrowly proscribe the actions which a Union may take in pursuing the interests of its members. Quite the contrary, the law recognizes that labor unions, like many large organizations, are made up of many diverse interests, each of which has its own narrow perspective. Inevitably the interests of these different constituent groups are going to come into conflict. Ultimately when these conflicts arise

the Union leadership is going to have to reconcile these various competing interests. Because reconciling these interests necessarily involves rejecting some points of view, the Union must be allowed broad discretion in dealing with its membership. See, *Hardcastle v. Western Greyhound Lines*, 303 F.2d 182, 185 (9th Cir. 1962). Accordingly it is clear that a Union may, consistent with the duty of fair representation, adopt a position contrary to that held by some of the individuals whom it represents. See, *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Thus the mere fact that a Union adopts a policy which is detrimental to the interests of some employees does not by itself establish a breach of the duty of fair representation. Rather the Union's duty to fairly represent its members is breached only when the Union's actions are arbitrary or discriminatory or when those actions are taken in bad faith.

In this case we do not believe that the course followed by the Transport Workers Union and its representatives was in any way arbitrary or discriminatory. Nor do we feel that the Union acted in bad faith when it entered into the November 1 accord. In the fall of 1972 the Transport Workers Union was confronted with a management decision to close the Eastbound Car Repair Shop and to convert that facility to a programmed repair plant. At that time the Union recognized that, given the collective bargaining framework then existing between the parties, management had the authority to take this action unilaterally. The Union also recognized the one consequence of the closing of the Eastbound plant would be the surplussing of some of the employees working there. Under the merger protective agreement these men, once surplussed, could be transferred to any job in the Penn Central system.

The Union therefore acted to protect the interests of these employees as best it could. Union officials extracted from management a commitment that any workers surplussed as a result of this plant closing would be transferred to the Altoona Heavy Repair Shop. Thus none of these surplussed men would be assigned to jobs far removed from their homes. Nor would any of these men lose their accrued seniority in the Eastbound District. That seniority would be dovetailed into the seniority roster of the Altoona Heavy Repair Shop. Therefore, with respect to the 20 men surplussed as a result of the closing of the Eastbound Shop the Union protected their interests completely.

As for the remaining men at the Eastbound Car Repair Shop, they were given the option of bidding on jobs at the Madden Shop in Hollidaysburg, Pennsylvania. All of these men were able to obtain work at the Madden Shop, work which was substantially the same as that they had previously performed. Some were able to work on the wreck train crew, a job which allowed for substantial overtime pay. None was required to take a job far from his home. None was furloughed by the railroad.

Admittedly these men did suffer some diminution of their seniority rights as a result of this change in employment. The Madden Shop was located in the Westbound Seniority District. When these men bid on jobs at the Madden Shop their names were placed at the bottom of that shop's seniority roster. However, by the fall of 1972 there was no action which the Union could have taken to protect the seniority rights of these men. Two years earlier, in 1970, these employees had ratified a prior rights agreement which provided for the end-tailing of seniority when employees transferred between the Eastbound and Westbound Seniority Districts. Accordingly the loss of seniority which these men felt in November of 1972 was a direct result of the prior rights agreement and not any wrongdoing by the Union leadership.

In sum, as a result of the Union's efforts in the fall of 1972, all of the men formerly employed at the Eastbound Car Repair Shop remained on the job with the Railroad. All of these men were able to obtain work in and around the Altoona area. None of these men had to accept a cut in wages. None was furloughed. While some

did suffer a diminution of their seniority rights, as a practical matter, this had little or no effect on their employment with the railroad. Moreover, this diminution of seniority was not the result of arbitrary bad faith conduct by the Union. Rather it was the product of an agreement ratified by the Union membership some two years prior to the closing of the Eastbound plant.

In the face of this record we can find no basis for the plaintiffs' allegation that the Unions and their officers breached their duty to fairly represent the employees at the Eastbound Car Repair Shop. Accordingly, the plaintiffs' claims against the defendant Unions and their officers must be dismissed.

Finally on this record we can find no factual basis to support the plaintiffs' allegations against their employer, Penn Central Transportation Company.

The plaintiffs' claims against the Railroad proceed on a slightly different basis than those asserted against the Unions. The plaintiffs do not allege that the Railroad, by itself, directly violated the duty of fair representation. Rather, throughout these proceedings the plaintiffs have contended that the Railroad conspired with the Union to improperly strip the men working at the Eastbound Car Repair Shop of their accrued seniority. As we perceive it this allegation requires proof of two elements. First, plaintiffs must demonstrate that the Union's actions violated the duty of fair representation by improperly denying these men their accrued seniority. Second, plaintiffs must show that the Railroad conspired with representatives of the Union to achieve this result.

Plaintiffs' proof of these two elements rests on their contention that the Railroad knew that union representatives were not authorized to enter into the November 1 agreement at the time that agreement was signed. *See, Goclowski v. Penn Central*, 571 F.2d at 759. This contention is the very crux of the plaintiffs' case against the Railroad. Yet we find no factual support for this contention.

At the hearings held before this court, representatives of both the Railroad and the Union testified that they believed the Union to be fully authorized to enter into the November accord. These individuals believed that the 1970 Collective Bargaining Agreement gave the Union the power to modify seniority districts by agreement with management. They also considered the closing of the Eastbound Shop to be a decision entrusted exclusively to management. Finally they recognized that the closing of this shop could impose significant hardships on the 33 men currently working there. Therefore these men concluded that the Union had both the right and the duty to protect the employees at the Eastbound Shop by entering into this accord.

We find the testimony of these witnesses to be credible. Moreover we feel that the opinions expressed by these men are consistent with both the text of the relevant collective bargaining agreements and past industrial practice. At no time in these hearings have the plaintiffs presented competent evidence from which we could infer that responsible Railroad officials acted in concert with the Union to deny these men their seniority. Rather, the record clearly demonstrates that the November 1 accord was the result of a unilateral management decision. Since the plaintiffs have failed to demonstrate any wrongful conspiracy by the Railroad their claims against Penn Central must be dismissed.